JOSEPH McVEY ET AL. v. JOHN H. BRENDEL.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS OF LANCASTER COUNTY.

Argued May 20, 1891—Decided October 5, 1891.

[To be reported.]

(*a*) The Cigar Makers' International Union of America, an unincorporated association formed " for promoting the mental, moral and physical welfare of its members," devised and adopted a label, to be pasted on boxes of cigars manufactured by members of the union. The association itself was neither a manufacturer of, nor a dealer in cigars.

(*b*) The label certified, over the signature of the president, that the cigars

Statement of Facts.

in the box to which it was affixed were made by a first class workman who was a member of the union, which was "opposed to inferior Rat-shop, Cooly, Prison, or Filthy Tenement-house Workmanship;" and therefore recommended the cigars to smokers throughout the world:

1. Not being a trader in any sense, the Cigar Makers' International Union could have no distinctive trade-mark, entitled to protection under the act of congress of July 8, 1870; and the registration of said label in the patent-office, in the manner prescribed for the registration of trade-marks, is unauthorized by the act, and would confer no right to have imitations thereof enjoined.

2. Nor, apart from the law of trade-marks, will equity give relief by enjoining the making and use of counterfeit copies of such a label; the purpose of which is to do harm to non-union men by covering them with opprobrium and preventing the sale of their work, the right of the association to use it being at least doubtful, whether the question be treated as one of morals or of law.

3. It seems: As such injunction must issue at the suit of the owner of the device infringed, and the ownership of the label was admittedly in the Cigar Makers' International Union, the officers of a local tributary association, subordinate to and a parcel of the Cigar Makers' International Union, had no standing to maintain a bill to enjoin the imitation of the label: Per Mr. Justice WILLIAMS.

Before PAXSON, C. J., STERRETT, GREEN, CLARK, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 360 January Term 1891, Sup. Ct.; court below, Equity Docket No. 2, page 326 C. P.

On June 16, 1888, Joseph McVey, president, and D. S. Hicks, Frank Gastiger and H. Brownstetter, trustees of the Cigar Makers' Union, No. 126, of Ephrata, Pa., filed a bill in equity for themselves and for all other members of the Cigar Makers' International Union of America, against John H. Brendel, praying for an injunction to restrain the defendant from using, upon boxes of cigars to be sold by him, certain labels charged to have been made in imitation of labels issued by the Cigar Makers' International Union of America, and from disposing of such counterfeit labels, or the plates from which they were made, otherwise than by their destruction. A preliminary injunction was awarded, and after argument was dissolved.

After answer by the defendant and replication, the cause was referred to *Mr. E. D. North*, as master, by whom the following facts were found:

The plaintiffs are cigar makers and members of the Cigar

Makers' Union, No. 126, of Ephrata, Lancaster county, Pa.,
and are respectively president and trustees of said union.   Said
union is connected with and acknowledges the jurisdiction and
control of the Cigar Makers' International Union of America,
and they complain for themselves and for all the other members
of the said Cigar Makers' International Union of America, num-
bering many thousands.

Said union is a voluntary unincorporated association of prac-
tical cigar-makers, formed for the purpose of promoting the
mental, moral, and physical welfare of its members, by assisting
them to obtain labor at remunerative prices, by affording them
pecuniary aid in sickness, and to maintain a high standard of
workmanship and fair wages as cigar-makers.   For the purpose
of designating the articles manufactured by members of the
union, the latter, in convention assembled in 1880, devised and
adopted a trade-mark or label to which they gave the name of
" Union Label," a fac-simile of which label is attached to plaint-
iffs' bill and made a part thereof.

The following is a copy of the said " Union Label: "

| Issued by Authority of the Cigarmakers' International Union of America.  UNION-MADE CIGARS.  This Certifies that Cigars contained in this box have been made by a First-Class Workman, a member of the Cigarmakers' International Union of America, an organization opposed to inferior Rat-shop, Cooly, Prison, or Filthy Tenement House Workmanship. There-fore we recommend these Cigars to all smokers throughout the world.   All infringements upon this Label will be punished according to law. [SEAL]   A. STRASSER, President,   C. M. I. U. | LOCAL STAMP. |
|---|---|

Prior to the adoption of the said union label by said Cigar
Makers' International Union, the same had not been known or
used in this country or elsewhere, and ever since said adoption
the members of said union have been and are now entitled to
the exclusive use of said union labels, and the same have been
pasted conspicuously on the outside of all boxes containing
cigars made by the plaintiffs and all the other members of the
said union.

The said union label affixed to cigar boxes is intended as a

Statement of Facts.

guaranty that the cigars therein contained are manufactured by members of the said union; that fair wages and good workmanship have been thereby secured, and that the cigars were not made in prisons or filthy tenement houses, and by inferior workmanship; and for those reasons the same command a higher price in the market than cigars of a similar appearance, but without said union label; and the use of said union label is a source of great profit to the plaintiffs and the other members of said union.

John H. Brendel, the defendant, is a manufacturer of cigars in Brecknock township, Lancaster county, Pennsylvania, and his shop is a strict union shop, and has been connected with the Cigar Makers' Union, No. 126, of Ephrata, continuously since some time in the year 1887, it having withdrawn from the union in 1887, and entered it again the same year. The defendant never was a member of the union, but he employed twelve hands in his shop, most of the time, who were members of the Cigar Makers' Union, No. 126, of Ephrata, which consists of about eighty members; and at the time the plaintiffs' bill was filed, he had about ten or eleven men employed in his shop, each of whom would make, on an average, about two thousand cigars per week, which were packed in boxes, some of which contained fifty cigars each and some of which contained twenty-five cigars each.

In accordance with article XI., § 3, of the constitution of the Cigar Makers' International Union of America, the defendant's shop was entitled to receive from the said local union, the Cigar Makers' Union, No. 126, of Ephrata, free of all charges, as many of these union labels as might be required from week to week for all cigars actually made by members of the union in his shop.

Since the defendant's shop re-entered the union in 1887, and up to the time of filing the plaintiffs' bill, the said local union furnished to the defendant all union labels that he or his shop collector asked for or demanded from time to time; and the said local union did not, nor did the proper officer thereof, nor the proper parties of whom demand was made, refuse to furnish to the defendant all the union labels that he or his shop collector demanded.

Shortly before the first day of June, 1888, the defendant

gave to Charles S. Yeager, a printer in Ephrata, a label of the same kind as the one attached to the plaintiffs' original bill, and instructed him to have made therefrom plates for the printing of said label. In pursuance of said instructions, Mr. Yeager had the plates made, and printed therefrom and sent to the defendant the proof of the said label, whereupon the defendant gave him an order for twenty-nine thousand of the said labels; and in pursuance of said order, Mr. Yeager printed for the defendant, from the said plates, twenty-nine thousand of the said labels, two thousand of which he sent to the defendant by mail about the first day of June, 1888, and the remaining twenty-seven thousand he delivered to the defendant personally, on or about the eighth day of June, 1888, together with the plates from which the said labels were printed.

These labels which Mr. Yeager printed for the defendant so closely imitate and resemble the genuine union label used by the plaintiffs, in the shape, size, and color of the paper, in the kind, size, arrangement and juxtaposition of the type, in the seal of the Cigar Makers' International Union of America and its relative position on the paper, in the signature of the president of the said international union, in the space left for the local stamp and its position on the paper, in the color of the ink used, in the character of the border surrounding the printed matter, and in general appearance, that they are well calculated to deceive, and would, if used, deceive and mislead the public into the belief that the cigars bearing the said counterfeit label were manufactured by members of the aforesaid union.

The said defendant intended to buy cigars from other factories in the vicinity where he lived, and to paste these counterfeit labels on the boxes containing those cigars; that is to say, on boxes containing cigars not made in his shop, nor by members of the said union, and he intended to sell the said cigars for union-made cigars, and thus to infringe the exclusive rights of the plaintiffs, and the other members of said union, to the use of the said union label.

The Cigar Makers' Union, No. 126, of Ephrata, did not, as a union, at the time of filing this bill, or at any time before, own, manufacture, trade in, or sell any cigars. The members of the Cigar Makers' Union, No. 126, of Ephrata, did not, at the time of filing this bill, buy or sell any cigars, but they were

Statement of Facts.

practical cigar-makers and made cigars; and this union label had been used on cigars made by the members of said local union, and the cigars made by them were sold by others with these union labels on them.

This union label is sometimes used by members of the Cigar Makers' International Union, of America, on cigars manufactured by them and sold by them, and it has been used on cigars manufactured by the members of the said union, and sold in the market since the adoption of said label by the said union in 1880. Some of the members of the Cigar Makers' International Union of America did, at the time of filing this bill, or before, manufacture and sell cigars.

The defendant had no authority from the union to have these labels printed. All the members of the said union, including the plaintiffs herein, have a common valuable pecuniary interest, right or property, in the union labels in question, or in the use thereof, or in both combined, which is entitled to protection in a court of equity, and the plaintiffs and the other members of the union will suffer irreparable injury if an injunction be not granted as prayed for.

—Upon the facts so found by him, the master, citing and considering: (1) High on Injunctions, § 748; Beatty v. Kurtz, 2 Pet. 584; Smith v. Swormstedt, 16 How. 288; Snow v. Wheeler, 113 Mass. 179; Birmingham v. Gallagher, 112 Mass. 190; Allen v. McCarthy, 37 Minn. 349; Equity Rules, § 22: (2) Amoskeag Mfg. Co. v. Trainer, 101 U. S. 53; Del. & H. Can. Co. v. Clark, 13 Wall. 311; 3 Pomeroy's Eq. J., § 1354; Farina v. Silverlock, 6 DeG. M. & G. 214; High on Injunctions, §§ 675, 677, 678; Hostetter v. Vowinkle, 1 Dill. C. C. 329; Palmer v. Harris, 60 Pa. 156; Pratt's App., 117 Pa. 411; Shaw Stocking Co. v. Mack, 21 Blatchf. 1; Lee v. Haley, L. R. 5. Ch. App. 155; Wotherspoon v. Currie, L. R. 5 Eng. & Ir. App. 508; s. c. 42 L. T. Ch., N. S., 130; 27 L. T., N. S., 393; Taylor v. Carpenter, 11 Paige 292 (42 Am. Dec. 114); s. c. 2 Sandf. Ch., 603; Hennessy v. Wheeler, 69 N. Y. 271 (25 Am. Rep. 188); Walton v. Crowley, 3 Blatchf. 440; Congress etc. Spring Co. v. Spring Co., 45 N. Y. 291 (6 Am. Rep. 82); Cook v. Starkweather, 13 Abb. Pr., N. S., 401; Strasser v. Moonelis, 108 N. Y. 611 (11 Cent. R. 461); Godillot v. Harris, 81 N. Y. 263; Ins. Oil Tank Co. v. Scott, 33 La. Ann. 946

(39 Am. Rep. 286) : (3) Section 173, act of March 31, 1860, P. L. 385 ; Brace Bros. v. Evans, 5 Pa. C. C. R. 163 ; Dixon Crucible Co. v. Guggenheim, 2 Brewst. 326 ; Pratt's App., 117 Pa. 401, reported the following as his conclusions of law :

1. That the plaintiffs are entitled to bring this action on behalf of themselves and the other members of the Cigar Makers' International Union of America, in whose behalf it is brought.[5]

2. That all the members of the said union, including the plaintiffs herein, have a common valuable pecuniary interest, right, or property, in the union labels in question, or in the use thereof, or in both combined, which is entitled to protection in a court of equity.[6]

3. That the act complained of is contrary to law.[7]

4. That the plaintiffs are entitled to an injunction as prayed for.[8]

The master, therefore, recommended that the injunction be granted.

Exceptions filed by the defendant to the report of the master having been argued, the court, PATTERSON, J., on January 17, 1891, filed an opinion in part as follows :

At the argument we were strongly impressed with the belief that the plaintiffs could not prevail in this case. But the more authorities we read, and the more consideration we gave the question, the more we were led to abandon our first convictions and yield our judgment to the views expressed by the learned master in his report. . . . .

The leading facts here are not in controversy. The law as relates to trade-marks as developed in the bill, is in Pennsylvania, we think, an unsettled question. Our Supreme Court have not, so far as we can discover, expressed its judgment on the question arising in this proceeding, namely, " that the plaintiffs as officers of an unincorporated association have no right to file or maintain a bill in equity in their own names as officers against any person," and therefore we do not intend to discuss it at length here. The master has not in our opinion ignored or evaded the law seemingly governing this case, but his views are fortified, it seems to us, by well-settled authorities, and we think will command respect. It would be no very

Arguments.

·difficult task to fill more than one page with points in the law ·of trade-marks, upon which directly conflicting decisions may ·be found among the reports. That being the case, and no au·thority of our highest court to guide us, we accept the law of the master's report and will confirm it. This conclusion renders further consideration of the merits of the master's report, or of objections or exceptions to it, unimportant. The exceptions filed are all dismissed, and the report of the master is confirmed.

—A formal decree, granting the perpetual injunction prayed for, having been entered, the defendant took this appeal, specifying inter alia that the court erred:

5–8. In overruling the exceptions to the master's conclusions of law.[5 to 8]

9. In not dismissing the bill.

10. In sustaining the bill and granting the injunction.

*Mr. N. Franklin Hall* and *Mr. D. G. Eshleman*, for the appellant:

A bill filed, like this one, by the officers of an unincorporated association cannot be sustained. Such an association cannot sue in the names of its officers. This bill does not contain the names of the members of the association, or any of them. It assigns no reason for the omission. Nor have the plaintiffs asked, nor laid the ground for asking that the discretion of the court be exercised as provided in Equity Rule V., §§ 21, 22.

1. The label in question does not fall within the definition of a trade-mark, and cannot be protected as such: Browne on Trade-marks, §§ 53, 54; Delaware etc. Canal Co. v. Clark, 13 Wall. 311; Burke v. Cassin, 45 Cal. 467 (13 Am. Rep. 204); Metcalf v. Brand, 86 Ky. 331; Amoskeag Mfg. Co. v. Trainer, 101 U. S. 53; Lawrence Mfg. Co. v. Manufacturing Co., 31 Fed. R. 776; Laughman's App., 128 Pa. 19; Hall v. Barrowes, 4 DeG. J. & S. 150; High on Injunctions, 1063; Leather Cloth Co. v. Cloth Co., 4 DeG. J. & S. 137 (11 H. L. 523); McAndrew v. Basset, 4 DeG. J. & S. 380; Farina v. Silverlock, 6 DeG. M. & G. 214; Ainsworth v. Wormsley, L. R. 1 Eq. 518; Maxwell v. Hogg, L. R. 2 Ch. App. 307; Herst v. Denham, L. R. 14 Eq. 542; Kerr on Injunctions, 475; Lawson v. Bank of London, 18 C. B. 84; Bispham's Eq., § 456;

Arguments.

Schneider v. Williams, 44 N. J. Eq. 391; Allen v. McCarthy, 37 Minn. 319; Cigar Makers' Union v. Conshaim, 40 Minn. 243; Weener v. Bryton, 151 Mass. 1. In Strasser v. Moonelis, 108 N. Y. 611 (11 Cent. R. 461), the merits of the case were not passed on. The label in question, not being a trade-mark, the plaintiffs suffered no irreparable injury, nor any injury at all for which a court of equity can furnish a remedy. Even if the defendant had fraudulently used this label, equity would not restrain him: Hall v. Barrowes, 4 DeG. J. & S. 150; Bispham's Eq., § 456; and therefore this bill must be dismissed. If plaintiffs have suffered any wrong at the hands of the defendant, their remedy is at law, in the recovery of damages.

*Mr. Marriott Brosius,* for the appellees:

The members of the union have a common interest in the union label. Some of them are competent to sue for themselves, and the others to restrain infringement of the label: Beatty v. Kurtz, 2 Pet. 584; High on Injunctions, § 748; Smith v. Swormstedt, 16 How. 288; Equity Rules, § 22.

1. The decree of the court below can be sustained on either of three grounds: (*a*) That the union label is a trade-mark. (*b*) That it is a label which the plaintiffs had a right to use to distinguish cigars of their make from others, and that the false representation contained in the counterfeit label, as to the origin of the goods to which it was to be affixed, being calculated to deceive the public and injure the plaintiffs, entitles them to redress on principles analogous to those governing technical trade-marks: Browne on Trade-marks, § 521; Amoskeag Mfg. Co. v. Trainer, 101 U. S. 53; Congress etc. Spring Co. v. Spring Co., 52 Barb. 526; Heinz v. Brueckmann, 134 Pa. 495; Carson v. Ury, 39 Fed. R. 777; Colton v. Thomas, 7 Phila. 257; Re Sykes, 43 L. T., N. S., 626; Sebastian on Trade-marks, 4. (*c*) That the use of the counterfeit label by the defendant in this case is forbidden by law, and should be restrained by equity as an unlawful act: § 173, act of March 31, 1860, P. L. 385; Dixon Crucible Co. v. Guggenheim, 7 Phila. 408; Brace Bros. v. Evans, 5 Pa. C. C. R. 163; Waugh v. Beck, 114 Pa. 428.

2. In numerous cases throughout the United States and Canada the right of the Cigar Makers' International Union

to have its label protected against piracy, has been passed upon. It was affirmed by the Superior Court of New York in Cigar Makers' Union v. Simm, 19 Abb. N. C. 88; by the Supreme Court of New York in People v. Fisher, 57 N. Y. 552, and by the Court of Appeals in Strasser v. Moonelis, 108 N. Y. 611 (11 Cent. R. 461). The High Court of Justice of Canada, Chancery Division, has sustained it. Lower courts have upheld it in the states of Ohio, Maryland, Illinois, Missouri, Nebraska, Rhode Island, Michigan, Wisconsin, Connecticut, Iowa, Massachusetts, California, Oregon and Texas. The only decisions by courts of last resort denying protection to the owners of this label, are Cigar Makers' Union v. Conshaim, 40 Minn. 243, overruling Allen v. McCarthy, 37 Minn. 349; and Weener v. Bryton, 151 Mass. 1. Whatever system of equity may be in vogue in Massachusetts and Minnesota, in Pennsylvania "no man will be permitted to sell his goods as and for those of another, by means of a counterfeit trade-mark, label or sign:" Putnam Nail Co. v. Dulaney, 140 Pa. 205.

OPINION, MR. JUSTICE WILLIAMS:

The question presented by this appeal is a new one; at least, it is new in this state. It involves important consequences to employers and employees, and it touches the rights and obligations of workmen in their relation to each other. The facts upon which the question is presented, as found by the learned master, are as follows:

The Cigar Makers' International Union of America is a voluntary, unincorporated association of workmen, organized, as its constitution affirms, "for promoting the mental, moral, and physical welfare of its members." It has devised and registered the label which is the subject of this controversy, and claims an exclusive right to control its use. The office of the label is to advise the public that the cigars in the box which bears it were made by members of the union. Every member of the union in the United States and Canada is entitled to have this label upon the cigars made by him. The plaintiffs represent neither the Cigar Makers' International Union, the alleged owner of the label, nor Strasser, the officer whose name appears upon it, but a subordinate local organization, known as No. 126, located at Ephrata, Lancaster county, Pa. No 126

did not devise or register the label, and does not claim to own it, but asserts the ownership of the international organization, to which it is a tributary and whose jurisdiction it acknowledges. The defendant is a manufacturer whose shop is, as the learned master finds, "a strict union shop" belonging to Union No. 126. His workmen, ten or twelve in number, are members of the union. He, as the owner of a union shop, and his men, by virtue of their membership, are entitled to the use of the label on the cigars made by them. He procured a quantity of imitation or counterfeit labels, because, as he alleges, he was refused the genuine when he applied for them, and avowed his purpose to use them. The plaintiffs then filed a bill, and asked the court to enjoin the defendant against the use of the imitation labels for any purpose whatever. Upon these facts, the master recommended, and the court made the decree asked for.

The grounds upon which an injunction will issue to restrain the infringement or appropriation of a trade-mark are well settled. They are, first, the protection of property in a trade-mark; and, second, the prevention of fraud by an imitator. In either case, it issues at the suit and for the protection of the owner of the device or trade-mark infringed. The plaintiffs represent Union No. 126, which has no other ownership in or control over the international union's label than any others of the hundreds or thousands of subordinate unions scattered over the United States and the Canadas. If it can maintain this bill, then each and every subordinate union can do the same thing, although no one of these devised, registered, or claims to own the trade-mark, and may prevent its use by workmen and in shops which, under the general rules of the international body, are entitled to use it. But we are not disposed to impale this case upon what may be thought to be a technical point. On the other hand, we will consider whether the International Cigar Makers' Union is a trader, whether the label in question is a trade-mark, and whether, upon any ground of equitable relief, the plaintiffs are entitled to consideration in a court of equity.

The first question is disposed of by the learned master upon the pleadings. The organization that devised, registered, and owns the label is neither a manufacturer nor dealer, and has no trade in which a trade-mark can be used.

Opinion of the Court.

The second question would seem to go with the first. Trade-marks are provided for by the act of congress of July 8, 1870. Registration is made under it by furnishing a statement, to be recorded in the patent-office, showing the names of the parties applying for the registration, with their residences and places of business; the class of merchandise, and a description of the goods composing the class, by which the trade-mark has been or is intended to be appropriated, together with a description of the trade-mark and fac-similes of it. This provision of the act clearly contemplates an actual business conducted by the person or persons named, the adoption of a trade-mark in that business, and its appropriation to a particular " class of merchandise " produced or sold by the parties making the registration. Any device, figure, or inscription which seems to indicate the personal origin of the goods may be adopted as a trade-mark: Laughman's App., 128 Pa. 19. Such trade-mark will be protected against fraudulent imitation, whether registered or not: Hoyt v. Hoyt, 143 Pa. 623. Registration affords evidence of ownership. Its object is to secure to the maker or dealer the fruits of his skill, industry, and reputation by a positive legislative provision: Pratt's App., 117 Pa. 411. But the act of congress referred to makes it clear that it is a maker or a dealer only who is entitled to protection, for it declares that the commissioner of patents " shall not receive and record any proposed trade-mark which is not and cannot become a lawful trade-mark." Now, if the Cigar Maker's International Union was a business organization engaged in making cigars for sale, it could adopt and use a trade-mark in its business, and acquire property in it. But it is not a business .organization. It neither makes nor sells cigars, but directs its attention to cigar-makers, and seeks " to promote the mental, moral, and physical welfare of its members." These are worthy objects. They deserve and should receive the encouragement and support of all right-minded men. It is obvious, however, that they are personal and social objects, not commercial ones. They do not look towards the production or sale of any class or quality of cigars or tobacco, but towards the personal elevation and comfort of cigar makers. I conclude, therefore, that the Cigar Makers' International Union of America is neither a trader, within the meaning of the common law, nor within

the purview of the act of congress. Not being a trader in any sense, it can have no distinctive trade-mark. Registration, under such circumstances, is not authorized by the act of congress, and if made, confers no title, and gives no standing-ground in a court of law or equity.

I come now to inquire whether the adoption of the label for the purposes set forth in the bill gives to the international union any ground for equitable relief. We have seen that this label is not a trade-mark, and that the union is not in a business that enables it to adopt or acquire a trade-mark. Still, it is urged that, as the defendant was about to use an imitation of the label, he should be enjoined, whether the label is a trade-mark or not. But what is this label, and why should it be protected? It purports to be "issued by the authority of the Cigar Makers' International Union of America" to the person who uses it. The name of the workman who made the cigars does not appear upon it, nor the owner or location of the shop at which they are made. It does not point out the personal or the local origin or ownership of the goods on which it is placed. On the other hand, it issues to every one of the many thousands of workmen who make up the membership of the union, and it certifies, in the name of the union, that the cigars in the box on which it is placed were made " by a first-class workman, a member of the Cigar Makers' International Union." Who this first-class workman was, where he lived, for whom he worked, the label does not tell. He is indorsed as a " first-class workman," because he is " a member " of the union. As to all who are not members, the label proceeds to define the position of the organization that issues it by describing their work as " inferior rat-shop, cooly, prison, or filthy tenement-house workmanship." The label then proceeds in these words: " Therefore we recommend these cigars to all smokers throughout the world." The value of this label is in the recommendation and the reasons given for it. The label is thus seen to be something quite different from a trade-mark in its character, its purpose, and the manner of its use, viz., a device to distinguish between union and non-union workmen, and to discriminate against the work of the latter. It says to the public in spirit and in effect: " Buy the cigars that bear this label, because they were made by a member of this union. Do not buy those

not bearing it, because they were made by workmen who do not belong to us. Such cigars are the product of 'inferior rat-shop, cooly, prison, or filthy tenement-house workmanship.'" It is the request of a powerful labor organization to "all smokers throughout the world" to take sides with it in its contest with those who are outside of its membership, by refusing to buy the work of such persons. It is an attempt to use the public as a means of coercion upon them, compelling them to unite with the union in order to find a market for their goods or their labor.

Right here, let us distinguish broadly between an object and the means employed to reach it. Organization is the privilege, perhaps I might say the duty, of labor; and an organization seeking to promote "the mental, moral, and physical welfare of its members," by securing fair wages, steady work, and the comforts of home for them, occupies a legitimate field of usefulness, and is capable of doing great good to its members and to the public. The Cigar Makers' Union is no doubt seeking to do such a work, and accomplishing much in that direction. What we are now considering is one of the means it employs to increase its membership, and to hurt workmen who do not belong to it. The real question now before us is whether the international organization of workmen shall have the help of a court of equity in making war upon all cigar makers who do not belong to it, and in driving their work out of the market by representing it as coming from inferior rat-shops, from coolies, prisons, or filthy tenement-houses. A "first-class workman" is one who does first-class work, whether his name is on the rolls of any given society or not. Filthiness and criminality of character depend on conduct, not on membership of the union. Legitimate competition rests on superiority of workmanship and business methods, not in the use of vulgar epithets and personal denunciation. When the Cigar Makers' International Union of America stigmatizes those who do not belong to it, and seeks to induce the public to discriminate against them and their work, by covering them with opprobrious epithets, it is not engaged in "promoting the mental, moral, and physical welfare of its members," but in trying to hurt and destroy those who do not choose to become members. While the courts would aid the former purpose in all ways within their power, they cannot help the latter.

Opinion of the Court.

We cannot justify the defendant's conduct. There is no rule of morals or of business upon which he can defend himself in the preparation and use of spurious labels. But it is not every wrong action that a chancellor will enjoin, because the purpose of an injunction is to protect the plaintiff in the exercise and enjoyment of a clear legal right, for an infringement of which the law does not afford an adequate remedy. If, therefore, the right of the plaintiff is doubtful, equity will withhold its aid. The plaintiffs in this case have no trade-mark to protect, and no right to a decree resting on the law relating to trade-marks. What they have is a label which recommends the purchase of cigars made by union men, and warns against the purchase of all others as inferior and unwholesome, because made in rat-shops, or prisons, or by coolies, or tenants of filthy tenement houses. Their right to use such a label may well be doubted, whether the question be treated as one of morals or of law. But the plaintiffs come into a court of equity, and seek to enlist the conscience of a chancellor in their behalf. They must come with clean hands, with a conscionable regard for the rights of others, ready to do equity on their part, and seeking only equity at the hands of the court. They do come in this case with the avowed purpose to do harm to non-union men, to prevent the sale of their work, to cover them with opprobrium; and they ask a court of equity to say that they have a right to do it. We decline to say so.

The decree of the court below is reversed, the injunction dissolved, and the bill dismissed.

As we cannot approve the conduct of the defendant, we shall not award him costs, but direct that each party pay the costs it has made, and that the fees of the master be paid in equal parts by the plaintiffs and the defendant.