A. G. Morris, G. W. Burket, Caleb Guyer, Thomas K.
Morris and C. A. Morris, Shareholders and Officers of
The Tyrone Gas & Water Company, *v.* A. A. Stevens,
G. L. Owens, D. S. Kloss, William Walton, The Tyrone
Gas & Water Company and C. J. Reddig, Appellants.

*Corporations—Issue of new stock.*

Where the capital stock of a corporation is increased by the issue of new
shares, each holder of the original stock has a right to subscribe for and
demand from the corporation such a proportion of the new stock as the
number of shares already owned by him bears to the whole number of
shares before the increase.

*Corporations—Equity—Injunction—De facto directors.*

A de facto board of directors of a corporation decided to issue additional
shares of stock, and authorized the issue of some of the new stock to one
of their number, without giving the stockholders generally an opportunity
to subscribe for it. The director paid for it, and the money was used for
the benefit of the corporation. A certificate for it was issued to the direc-
tor, and through the possession of the certificate, he secured control of a
majority of the stock. He then sold a portion of the new issue to one
who had no knowledge of the illegality of the board of directors which
authorized the issue of the stock. Subsequently a stockholders' meeting
was called, but before it met an injunction issued restraining the holding
of an election which was the principal object of the meeting. The meeting
was held, but owing to the injunction none but the de facto directors at-
tended. At the meeting, the action of the de facto board was ratified.
Subsequently the de facto board was ousted by quo warranto proceedings.
*Held*, (1) that the assignee of a portion of this stock is entitled to hold the
same ; (2) that it would be inequitable to cancel the new stock in the hands
of the director after the corporation had received the benefit of the pay-
ment, but it was proper to continue a preliminary injunction restraining
him from voting it, or selling it, or disposing of it.

Argued April 23, 1896.    Appeal, No. 178, Jan. T., 1896, by
defendants, from decree of C. P. Blair Co., Equity Docket " A,"
No. 222, on bill in equity.   Before STERRETT, C. J., McCOL-
LUM, MITCHELL, DEAN and FELL, JJ.   Affirmed.   DEAN, J.
dissents.

Bill in equity for an injunction.   BELL, P. J., filed the fol
lowing opinion in the nature of report of a master.

FINDING OF FACTS.

On July 4, 1892, an annual election for officers of the Tyrone Gas & Water Company was held. Two tickets were in the field. The so-called Morris ticket was, Caleb Guyer for president; C. A. Morris for secretary and treasurer; A. G. Morris, C. A. Morris, Thomas K. Morris, Caleb Guyer, Dr. G. W. Burket and A. A. Stevens, Esq., for directors. Said named candidates, with the exception of Mr. Stevens, are the plaintiffs in this suit. The so-called Stevens ticket was, A. A. Stevens, Esq., for president; G. Lloyd Owens, Esq., for secretary; D. S. Kloss, for treasurer; A. A. Stevens, G. Lloyd Owens, D. S. Kloss, William Walton, Charles A. Morris, and A. G. Morris, for directors. Said last named candidates, with the exception of Messrs. A. G. and Charles A. Morris, are present defendants. The tellers declared the Stevens ticket elected, and the candidates named on it, with the exception perhaps of Messrs. A. G. and Charles A. Morris, entered upon the duties of their respective offices, and continued to act as officers of said corporation until May 30, 1895, when they were ousted from office by a decision of the Supreme Court (see Commonwealth v. Stevens, 168 Pa. 582), in an action of quo warranto brought by the present plaintiffs, candidates on the Morris ticket.

The act of March 10, 1865, incorporating said Tyrone Gas & Water Company authorized the issue of four thousand shares of stock of the par value of $5.00 per share. No stock had been issued for a number of years prior to said election of July 4, 1892. At that date there were eighteen hundred and sixty-nine (1869) shares outstanding. The respective then holdings of stock, material to this case, were: A. G. Morris 949, G. W. Burket 3, Caleb Guyer 3, Thomas K. Morris 3, and C. A. Morris 3; total shares of A. G. Morris and his friends, 961; A. A. Stevens 879, G. L. Owens 5, William Walton 1, D. S. Kloss 1; total shares of Mr. Stevens and his friends, 887.

At a meeting of the so-called Stevens board of directors (A. G. Morris and Charles A. Morris not being present), on July 18, 1892, it was resolved to issue 631 additional shares of stock so as to bring the total issue up to 2,500 in order to constitutionally refund the bonded debt at a lower rate of interest. At said meeting Mr. Stevens at once subscribed for 350 shares and in a short time paid $3,500 into the corporation treasury;

the subscription price of such new issue being fixed at $10.00 per share.  The money so paid in by Mr. Stevens was used in lifting old bonds and paying debts of the company.  G. L. Owens and D. S. Kloss likewise each subscribed for fifty shares but never paid for the same.  A certificate for his said 350 shares was duly issued to Mr. Stevens.

On November 29, 1893, Mr. Stevens sold to C. J. Reddig 100 of said 350 shares, and a transfer of same was duly made on the books of this company to Mr. Reddig and a certificate of stock in due form issued to him.  Mr. Reddig is the other defendant, in addition to the candidates on said Stevens ticket, in the present suit.  At the time he purchased said stock he had no knowledge of the illegality of the board of directors which authorized the issue of said stock.  He paid for same by giving his note to Mr. Stevens.  Said note was renewed from time to time by Mr. Stevens.  The last renewal, in the spring of 1895, was in due course of business discounted by the First National Bank of Tyrone, and was paid off by Mr. Reddig a few days before the trial of this case.  Mr. Reddig obtained the money for payment of said note by pledging the stock to a Carlisle bank which had no knowledge of any irregularity in the issue of stock.

No offer was made by the acting officers of the company to allow each stockholder to subscribe for the said additional issue of stock in proportion to holdings of old stock.  A. G. Morris was financially able to pay for his proper proportion of such new stock, and would have done so had he been given an opportunity so to do, and had he believed the stock was legally issued.  He first became aware of the new issue of the stock by reading an affidavit of Mr. Stevens, filed about September 18, 1892, in the equity proceeding (hereinafter mentioned as brought in connection with the quo warranto suit), and the other plaintiffs likewise obtained knowledge of such additional issue of stock in a similar way.

On August 1, 1892, plaintiffs commenced an action of quo warranto to oust the so-called Stevens officials and prosecuted the same to judgment of ouster.  An informal bill, or petition, in equity was filed in connection with, and at the inception of said quo warranto proceeding, and docketed to 185½ equity docket.  In said bill an injunction was asked to restrain the issue of stock, but beyond the obtaining of and having continued

a preliminary injunction, nothing was done in said equity proceeding, possibly because it was deemed to be too informal. The present bill was filed on June 18, 1894, and seems to be a substitute for said original equity proceeding.

Charles A. Morris attended several meetings of the acting board of directors for the purpose of protesting against the legality of the actions of said board, and did so protest. The other plaintiffs made no protest against the issue of said stock, or the payment by Mr. Stevens of his $3,500, excepting in so far as their actions in bringing and prosecuting said legal proceeding may be deemed a protest.

No election for officers of said company has been held since July 4, 1892, the holding of such election having been deferred from time to time by decrees of this court.

The evidence in this case is voluminous, and testimony was taken on other questions, but the foregoing are deemed all the facts necessary to be found in order to dispose of the legal questions involved.

## CONCLUSIONS OF LAW.

Defendants, at the time of the issue to Mr. Stevens of the three hundred and fifty shares of stock,—the principal, if not the sole bone of contention, in this action,—were not officers de jure but only de facto.

C. J. Reddig is a purchaser for value of part of said stock without actual notice that said persons issuing it, and sanctioning its transfer to him, were but officers de facto. Can he hold the stock? In Dovey's Appeal, 97 Pa. 162, our Supreme Court declined to decide whether the doctrine of lis pendens is applicable to a transfer of stock, but the general trend of recent decisions is that said doctrine is not applicable if such transfer be made before final decree and while the litigation is still pending. In Cook on Stock, section 362, the rule is so laid down and the tendency seems to be to liken the transfer of stock to that of negotiable paper. The issue and transfer, or consenting to transfer, of stock is within the sphere of the official acts of officers of a corporation. In Cook on Stock, section 713, it is said: " The contracts of an officer, acting within the sphere of his office, are binding on the corporation." More especially is this true where the rights of third parties have intervened.

I conclude therefore that Mr. Reddig is entitled to hold his one hundred shares of stock.

Can Mr. Stevens likewise retain the other two hundred and fifty shares of stock, or are said shares void because issued by him at a time when he was undertaking illegally to act as president and director? The research of counsel has produced no case precisely analogous to the present one, and the answer to the last interrogation is not entirely free from doubt. An officer de facto in general is not allowed to profit by the opportunity afforded him by reason of his illegal occupation of the office, but, on the other hand, his acts are often held to be binding on the company on the principle of estoppel. In Delaware and Hudson Canal Co. v. Pennsylvania Coal Company, 21 Pa. 146, the acts of a de facto board of directors were sustained in part at least because of money expended and no offer to refund or repay the same.

In the present case Mr. Stevens paid his $3,500 into the corporation treasury; it was expended for the benefit of the corporation; no offer has been made to repay him his money. This being so I think it would be inequitable to compel the cancelation of his stock and the loss to him of his $3,500, and so long as Mr. Stevens is not allowed to obtain an unfair advantage by reason of the issue of the stock, plaintiffs, it seems to me, have no equitable ground of complaint. [But Mr. Stevens should not be allowed to use this stock to control elections. To add said stock to the eight hundred and eighty shares already owned by him, and to allow him to vote such aggregate number of shares would be to give him control of any election held at present. This in effect would be permitting him to profit by his own wrong in issuing the stock while he was illegally acting as president and an illegally elected board of directors were in power. The result, so far as plaintiffs are concerned, would be the same, whether the intention of Mr. Stevens in subscribing for the stock was to obtain control of the corporation or not,] [7] hence we deem it unnecessary to decide whether he had such intention. But there is another cogent reason for restraining the voting of this stock. "Where the capital stock of a corporation is increased by the issue of new shares, each holder of the original stock has a right to offer to subscribe for and demand from the corporation such a pro-

portion of the new stock as the number of shares already owned by him bears to the whole number of shares before the increase. This pre-emptive right of the share holders in respect of new stock is well recognized.   The rule applies to such part of the original stock as is issued long after business has been commenced by the company.   Especially is this the rule where the directors issue new stock to themselves or to their friends in order to control an election or make a profit: " Cook on Stock, section 286.

Counsel for defendants cite Curry v. Scott, 54 Pa. 277, as holding that the above rule is not law in Pennsylvania.   Some of the remarks of STRONG, J., in his opinion, might seem to sustain said contention, but a closer examination of the case shows that he puts his decision on the ground that " the bill does not allege that plaintiffs or any of the old stockholders offered or that they were willing to take " the additional stock. On the other hand, Reese v. The Bank of Montgomery Co., 31 Pa. 78, recognizes the existence of the foregoing legal rule laid down by Cook on Stock.   Nor does it seem just and equitable to restrict the remedy of plaintiffs to a suit against the corporation, such as was brought in said case of Reese v. The Bank of Montgomery Co.   Such a remedy is inadequate and partially inequitable, as plaintiffs in effect would be taking part of the damages recovered out of their own pockets, because their own stock would be diminished in value by reason of the amount paid out of the corporation treasury in the form of damages : Dousman v. Wisconsin & Lake Superior Mining Co., 40 Wisconsin, 418.   Mr. Stevens should therefore be restrained from voting the stock in question until plaintiffs have an opportunity to restore the equilibrium of the respective holdings of stock as it existed on July 4, 1892, by subscribing for additional stock. As he has parted with one hundred shares of his new stock a like number of shares of his old stock should be held within the grasp of the law, otherwise he might be able, by voting the one hundred shares of his friend, C. J. Reddig, to control the elections of the corporation.   If Mr. Stevens desires to sell all his stock, the decree requiring him to hold at least one hundred shares could easily be moulded so as to require the purchaser to hold the one hundred shares under the same restriction as when they were held by Mr. Stevens.

[The contention of defendants that plaintiffs have been guilty of laches, to my mind, is without force.  Laches operates by way of estoppel.  Acquiescence may be presumed from failure to remonstrate, but whether such acquiescence will be presumed depends upon the circumstances surrounding each particular case: Railroad Co. v. Cowell, 28 Pa. 329; Cook on Stock, section 161.  The circumstances surrounding this case rebut the idea that plaintiffs acquiesced in the action of Mr. Stevens and the directors in issuing the stock.  Plaintiffs promptly commenced quo warranto proceedings to oust defendants.  At every stage of the controversy they have, by litigation, been saying to defendants "your acts are illegal."  What stronger notice could they have given defendants that the action of defendants, as officers de facto, were illegal and would be disavowed?  Defendants certainly could not have been misled by any act on part of plaintiffs.] [8]

As this litigation was occasioned by the illegal acts of defendants in assuming to act as officers of the company, when in fact they were not legally elected as such, it seems but right that defendants (excepting C. J. Reddig) should pay costs.

DEFENDANTS' REQUESTS FOR FINDINGS OF FACT, AND ANSWERS OF THE COURT THERETO.

1. That the Tyrone Gas & Water Company was incorporated by an act of the general assembly of Pennsylvania, approved March 10, 1865, to supply gas and water to the borough of Tyrone, in Blair county, Pennsylvania, with an authorized capital of $20,000, divided into four thousand shares of the par value of $5.00 per share; and that under its charter of incorporation to the said company constructed water works and gas works, and the same have been used from the time of their construction up to this date. *Answer:* Affirmed.

2. That by said act it is among other things provided, " That the stockholders shall annually, on the first Monday of July of each year, elect a president, six managers, secretary and treasurer of said company."  *Answer:* Affirmed.

3. That on the first Monday of July, 1892, A. G. Morris, Caleb Guyer, G. W. Burket and C. A. Morris, of the plaintiffs, and A. A. Stevens, G. L. Owens, D. S. Kloss and William Walton, of the defendants, all stockholders, or claiming to be

stockholders, of said company, met to hold the annual election for officers and managers. That G. W. Burket, G. L. Owens and William Walton, were appointed and acted as tellers, who, after retiring and computing the votes cast, unanimously returned the following persons elected: A. A. Stevens, president; D. S. Kloss, treasurer; G. L. Owens, secretary; A. G. Morris, A. A. Stevens, C. A. Morris, D. S. Kloss, G. L. Owens, William Walton, managers. *Answer :* Affirmed.

4. That having been so declared as the duly elected officers and managers of said company, all of defendants assumed and performed the duties of their respective offices, and acted as such officers and managers until the 4th day of June, 1895, during all of which time they had exclusive custody and charge of the seal, books, money, property and franchises of the said company; exclusively managed and conducted all its property, business and affairs, and were generally recognized as and reputed to be the officers and managers of the said company. *Answer :* Affirmed.

5. That of the plaintiffs, A. G. Morris and C. A. Morris, and of the defendants, A. A. Stevens were undisputedly elected managers of said company at the election held July 4, 1892; and that during a part of that time from July 5, 1892, to June 5, 1895, said C. A. Morris attended the meetings of said board of managers; that at all times both A. G. Morris and C. A. Morris received notice of, and could have attended said meetings; and that the minute book of said board of managers was always open to inspection by the plaintiffs. *Answer :* Affirmed.

6. That on the 18th day of July, 1892, the said company had an outstanding indebtedness of $31,500, which was bearing interest at the rate of seven and three tenths per cent per annum, plus state tax; and that, at the same date, of the authorized capital stock of the company, there had been issued 1,869 shares, upon which there had been paid into the company, at the par value of $5.00 per share, the sum of $9,345, which comprised all of the paid up capital of the said company. *Answer :* Affirmed.

7. That on the 18th day of July, 1892, at a meeting of said board of managers, the financial condition of the company was considered, and among other things it was " Resolved, That the present bonded indebtedness be reduced by payments to the

sum of $25,000, and that the remaining bonded debt be refunded on a basis of six per cent. The bonds to be secured by a mortgage on the property of the company, which the officers of the company are hereby authorized to execute. That the bonds be redeemable after five years, at the option of the company, and the principal payable in ten years." At the same meeting of the board of managers said board authorized and directed the sale of 631 shares of the authorized, but unissued, capital stock of the company to make the paid up capital $12,500, so that bonds to the amount of $25,000, could be legally issued. The amount realized from the sale of the stock thus issued to be used in reducing the amount of the bonded indebtedness. Said stock was authorized to be sold at $10.00 per share, that being the highest price ever paid for the stock of the company up to that date. *Answer :* Affirmed.

8. On the 26th day of July, 1892, A. A. Stevens, one of the defendants, and a manager—de jure and de facto—purchased 350 shares of said stock for which he paid, at the price fixed, to the treasurer of the company the sum of $3,500, and received certificate No. 166, dated July 26, 1892. *Answer :* Affirmed.

9. At the time of said purchase A. A. Stevens was the owner of 886 shares of the previously issued capital stock of said company, but that said 886 shares added to the 350 purchased July 26, 1892, did not give him a majority of the capital stock authorized to be issued. *Answer :* Affirmed.

10. That said 631 shares so directed to be sold by said board, and said 350 shares so purchased by A. A. Stevens were for the advantage of said corporation, and to enable the company to refund its old indebtedness at a lower rate of interest, and lawfully to issue the bonds and execute the mortgage as aforesaid; and that the money received by the company for said stock was actually applied on account of payment of its indebtedness. *Answer :* Affirmed.

11. That none of the plaintiffs ever offered to purchase any portion of said authorized issue of 631 shares of stock. *Answer :* Affirmed, with the qualification that no opportunity was given them by the officers of the company so to purchase.

12. [On the 27th day of September, 1893, the plaintiffs had full and particular information and notice of the action of the

board of managers, as aforesaid, in authorizing the sale of 631 shares of the unissued capital stock, as aforesaid, the determination of said board of managers to refund the bonded indebtedness, the sale of the 350 shares of said stock to A. A. Stevens, and the uses and purposes for which said sale was made, and to which the money realized therefrom was to be applied. *Answer:* Denied as put. I do not consider the notice they received by reading an affidavit made by Mr. Stevens "full and particular information and notice."] [1]

13. That on the 8th day of August, 1893, the said company executed and delivered to D. S. Kloss, as trustee, its mortgage to secure said bonded indebtedness of $25,000, to be issued in pursuance of the aforesaid resolution, and of which bonded indebtedness $19,000 was issued and disposed of, and the proceeds applied to paying the outstanding indebtedness of the company, which said mortgage was duly recorded in the recorder's office of Blair county, September 1, 1893, in mortgage book, vol. 44, page 465. *Answer:* Affirmed.

14. That with the proceeds realized from the sale of said 350 shares of stock to A. A. Stevens, the $19,000 realized from the sale of said bonds and other revenues and resources of said company, its old bonded indebtedness of $31,500, bearing seven and three tenths per cent interest, plus state tax, was entirely paid off. *Answer:* Affirmed.

15. [That from the 27th day of September, 1892, until the 26th day of June, 1894, the date of the filing of the bill in this case, the plaintiffs, with full knowledge of the sale of the 350 shares of the unissued stock to A. A. Stevens, the purpose for which the same was issued, the appropriation of the proceeds thereof to the reduction of the bonded indebtedness of the company, and the replacing of the remaining outstanding bonded indebtedness of the company at a lower rate of interest, made no protest or objection by any instituted legal proceedings to the sale of the said 350 shares of the unissued capital stock, or the appropriation of the money realized therefrom to the reduction of the indebtedness of the company, or to the refunding of the remaining bonded indebtedness of the company. *Answer:* Denied, as I view the matter the legal proceedings pending was a protest against the issue of the stock.] [2]

16. That at the regular meeting of the stockholders of said

company held on the charter day, the first Monday of July, 1894, of which all the plaintiffs had due notice, the said board of managers made an exhaustive report of their conduct of the affairs of said company, including a detailed account of the issue and sale of said stock and the refunding of said loan; and thereupon the stockholders of said company passed a resolution ratifying and confirming the act of said board of managers. *Answer:* Affirmed.

17. [That from the 27th day of September, 1892, up until June 28, 1894, the plaintiffs made no effort to prevent the refunding of said bonded indebtedness, the appropriation of the money paid by A. A. Stevens for the 350 shares of stock to the reduction of the debt, or the issuing of the refunding loan, but with full knowledge of such action upon the part of the company and of A. A. Stevens, and without any protest or legal proceedings to restrain the same, permitted said purchase money and new loan to be applied by said company to the redemption of its old bonded indebtedness, and in common with other stockholders of said company, received the benefit of said subscription and loan. *Answer:* Denied as put, but affirmed in so far as it relates to permitting Mr. Stevens to pay his money into the treasury for the benefit of the company.] [3]

DEFENDANTS' REQUESTS FOR FINDINGS OF LAW, AND ANSWERS OF THE COURT THERETO.

1. The evidence in this case showing that on the 4th day of July, 1892, the tellers holding the election for the officers of the Tyrone Gas & Water Company returned the defendants, inter alia, as the duly elected officers, etc., and thereupon they entered upon the discharge of their duties incident to their respective offices, no others assumed to fill such offices, and they continued to fill the same until the 4th day of June, 1895. They were, therefore, officers of the Tyrone Gas & Water Company de facto, and their acts as such were binding on the company. *Answer:* Some of their acts were binding on the company.

2. That it was within the powers of the de facto board of managers to direct the sale of 631 shares of the authorized but unissued capital stock of the company, to enable it to lawfully issue new bonds at a lower rate of interest, to take up the outstanding indebtedness of the company which was bearing a

higher rate of interest.  *Answer:* Affirmed, with the qualification that all stockholders should have been afforded a fair opportunity to take said stock in proportion to their holdings.

3. That where a purchase of the unissued capital stock of a corporation is made by a director (manager) thereof, at a full price, for the purpose of enabling the company to issue new bonds with which to refund its existing corporate indebtedness at a lower rate of interest, and the officers and stockholders of said company accept such loan with full knowledge of said sale of stock upon which the validity of said loan was predicated, and for more than 21 months stand by without protesting or taking any action to call in question the validity of such loan, or of such sale of stock, they are estopped from asserting that such purchase of stock is invalid because authorized by a de facto board of managers of which the purchaser was a member de jure and de facto.  *Answer:* Denied as put, but I have already decided in my general report or opinion that the stock of Mr. Stevens should not be canceled.

4. The mere fact that A. A. Stevens, who purchased at a full price 350 shares of said stock, was a manager de jure et de facto of said corporation would not invalidate his said purchase as to other stockholders, the plaintiffs in this bill, who, with full knowledge of such purchase and the proposed payment and refunding of the corporate indebtedness, stood by without protest or objection to the same for over 21 months, and allowed said transaction to be consummated, and the $3,500 received from the sale of said stock to be applied to the payment of corporate indebtedness.  Same answer as to third point.

5. [The action of the stockholders at the stockholders' meeting on the first Monday of July, 1894, of which meeting plaintiffs had due notice, was a ratification of the acts of the de facto board of managers, and of the purchase of 350 shares of stock by A. A. Stevens, and plaintiffs are estopped from calling the same in question.  *Answer:* I decline to affirm this point, as I do not deem the action of said stockholders' meeting a ratification.] [4]

6. Where fraud is alleged to avoid an act done it must be proved and will not, in the absence of proof, be presumed. Mere circumstances of suspicion are not enough to brand with fraud a transaction undertaken for a lawful purpose and which

was advantageous to the plaintiff party, in the name and behalf of which it was carried on. *Answer :* Affirmed.

7. Whether or not the de facto managers intended to commit a fraud at the time they authorized the issuing of 631 shares of stock is the criterion by which their acts must be considered, and not the effect of the act upon the parties charging the fraud. Without fraudulent intent being established the transaction cannot be impeached, and a fraudulent intent will not be presumed without satisfactory proof of its existence, which can scarcely be asserted when a proper motive (as in this case, the lawful issuing of bonds to refund the outstanding indebtedness of the company) exists, and which might have been as readily the operating motive as the fraudulent motive alleged by plaintiffs in their bill. *Answer :* Affirmed as an abstract legal proposition, but I deem it unnecessary to determine in this case, what motive induced the issue of the stock in question.

8. The answers of the defendants, the resolutions of the board of managers and the testimony of the defendants, all showing that the sale of 631 shares of the unissued capital stock of the company, was authorized by said board for the purpose of enabling said corporation lawfully to refund its outstanding bonded indebtedness at a lower rate of interest; such purpose so proved to have existed, is a proper motive for said act, which might have been as readily the operating motive as the fraudulent one alleged by plaintiffs; and under such circumstances the presumption in favor of the honesty and good faith of the transaction will prevail, and the court will not declare the same to be fraudulent. *Answer*: Affirmed as an abstract legal proposition, but deemed inapplicable in the present case, as it is unnecessary to decide what motive induced the issue of said stock.

9. [Even if the plaintiffs were entitled to allotment out of the 631 shares of the unissued capital stock of said company, authorized to be sold, they have waived such rights by their long acquiescence and recognition of the purposes and participation in the benefits, for which said stock was authorized to be sold. *Answer:* Denied.] [5]

10. [That from September 27, 1892, up until June 28, 1894, the date of the filing of plaintiff's bill, a period of more than twenty-three months, they, not having made any offer to

take any portion of the 631 shares of the authorized issued stock, or claiming that the same would have sold for more than the price fixed, cannot now complain or call in question the validity of the issuing of said stock, or the sale of 350 shares of the same to A. A. Stevens, and are without remedy in equity, and the proceedings in this case should be dismissed. *Answer :* Denied.] [6]

11. [Under all the evidence in this case the plaintiffs have failed to sustain the allegations in their bill, and the same should be dismissed with costs.] *Answer :* Denied. [7]

### DECREE.

This case came on to be heard and was argued by counsel and after due consideration, now, December 23, 1895, it is ordered, adjudged and decreed as follows :

[1. That A. A. Stevens, Esq., until the further order of the court be restrained from voting, also from selling or in otherwise disposing of the following stock of the Tyrone Gas & Water Company held by him, to wit: the two hundred and fifty shares balance of the three hundred and fifty shares subscribed for by him in July, 1892, also one hundred shares of his old stock, it being the purpose of this last mentioned provision to require him to keep in his possession at least one hundred shares of stock in lieu of the stock he sold to C. J. Reddig.] [9]

2. As to C. J. Reddig the bill is dismissed.

[3. The costs of this proceeding are to be paid by defendants excepting C. J. Reddig.] [9]

*Errors assigned* were (1–8) portions of opinion as above, quoting them; (9) the decree, quoting it.

*A. O. Furst,* with him *Stevens, Owens & Pascoe,* for appellants. —The action of de facto board of managers in refunding the debt of the corporation and the sale of the three hundred and fifty shares of stock in controversy, as an incident thereof, was within the powers of said board, and to the advantage of the corporation.

. The plaintiffs' neglect to act promptly, as they should have acted, is a bar to their right to maintain this bill : Watt's App., 78 Pa. 370 ; Gordon v. Preston, 1 Watts, 385 ; Ashhurst's App.,

60 Pa. 290; Manhattan Hardware Co. v. Phelen, 128 Pa. 110; Shellenberger v. Patterson, 168 Pa. 30.

Ratification is in general the adoption of something already performed, notwithstanding the vice that renders it relevantly void; and is equally within the power of a corporation as of an individual; and by the very nature of ratification, confirmation or affirmance, the party ratifying becomes a party to the transaction, and is bound where he would not be bound: Pearsoll v. Chapin, 44 Pa. 9; Negley v. Lindsey, 67 Pa. 217; Seylar v. Carson, 69 Pa. 81.

Plaintiffs were bound to disavow any unauthorized acts of the de facto managers as soon as they had knowledge of the same: Bredin v. Dubarry, 14 S. & R. 27; Howard v. Turner, 155 Pa. 349; 2 Pomeroy's Equity, 817; Mehaffy v. Ferguson, 156 Pa. 156; Bank of Penna. v. Reed, 1 W. & S. 101; Wharton on Agency, sec. 72; Kelsey v. Nat. Bank, 69 Pa. 426; Pittsburg Ry. v. Bridge Co., 131 U. S. 371.

The plaintiffs have a full, complete and adequate remedy at law; if they have sustained any damage by reason of the sale of three hundred and fifty shares of stock by defendants they must resort to the law for such relief. The stock in controversy having been sold, paid for and transfered to appellants twenty-three months before the filing of this bill, the ownership of the same became vested in him for all purposes: Kimmell v. Stoner, 18 Pa. 155; Kimmell v. Geeting, 2 Grant, 125; Bank of Montgomery v. Reese, 26 Pa. 143; Curry v. Scott, 54 Pa. 270; Erdelman v. Brower, 58 Ill. 447.

*W. L. Hicks*, of *Hicks & Templeton*, and *Thos. H. Murray*, for appellee. Plaintiffs were not guilty of laches: Cook on Stock and Stockholders, sec. 161; R. R. v. Cowell, 28 Pa. 329; Crumlisle v. Shenandoah etc. R. R., 28 W. Va. 623.

A resolution of a board of directors of a corporation carried by the casting vote of the president ratifying an unauthorized act of his in which he is personally interested is void: Taylor on Private Corporations, sec. 628; Chamberlain v. Pacific Co., 54 Cal. 103; Davis v. Rock, 55 Cal. 559; Guild v. Parker, 43 N. J. L. 430; Rhodes v. Webb, 24 Minn. 292; F. N. Bank v. Drake, 29 Kan. 311.

Where the capital stock of a corporation is increased, the old

stockholders have a right to subscribe for the new stock in proportion to their holdings of old stock, and this rule applies where a part of the authorized capital stock is issued long after the corporation has commenced business : Cook on Stock and Stockholders, sec. 70 ; Biddle's App., 99 Pa. 278 ; Smith's Est., 140 Pa. 344 ; Reese v. Montgomery Bank, 31 Pa. 78 ; Eidman v. Bowman, 58 Ill. 444.

The effect of an action for damages would be to convert a part of appellants' interest as a shareholder into a judgment for damages, in other words to sell a portion of his stock to the corporation : Cook on Stock and Stockholders, p. 388 ; Dousman v. Wisconsin & Lake Superior Co., 40 Wis. 418.

Under the prayer for general relief, any relief appropriate to the bill, though differing from the special relief prayed for may be granted : Slemmer's App., 58 Pa. 156 ; Bullock v. Adams' Executors, 20 N. J. Eq. 367 ; Beach's Equity Practice, sec. 91.

He who seeks equity must do equity : 1 Pomeroy's Eq., sec. 387 ; Comstock v. Johnson, 46 N. Y. 615 ; Tripp v. Cook, 26 Wend. 143 ; McDonald v. Neilson, 2 Cowen, 139 ; Cusher v. Shipman, 35 N. Y. 533.

Equity always attempts to get at the real substance of things and to ascertain, uphold and enforce rights and duties which spring from the real relations of the parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects and consequences of the transaction : 1 Pomeroy's Equity, sec. 378 ; Broom's Legal Maxims, 282 ; Com. v. Stevens, 168 Pa. 582 ; Riddle v. Bedford County, 7 S. & R. 391 ; King v. Phila., 154 Pa. 169 ; Zearfoss v. Farmers & Mechanics Institute, 154 Pa. 449 ; Neale v. Overseers, 5 Watts, 538 ; Commissioners v. Kissau, 2 Rawle, 139 ; Shellenberger v. Patterson, 168 Pa. 30.

OPINION BY MR. CHIEF JUSTICE STERRETT, January 4, 1897 :

We are not convinced that any harm can come to this appellant from permitting the interlocutory decree appealed from to stand and the cause to proceed to final hearing and decree in the court below ; nor, are we satisfied that there is anything in the record as presented that would justify us in sustaining either of the specifications of error.

In general, the present holders of stock have a primary right

to subscribe in proportion to their holdings for any new issue. The stockholders themselves certainly may determine otherwise and order a sale to the public, and payment of the proceeds into the treasury. But this is exceptional and the exercise of a reserve power which should not be permitted unless there is a clear intent of the stockholders to do so.

The issue of stock in the present case was not within this power. It was made by a de facto board on the heels of a disputed election followed by quo warranto proceedings which resulted in ousting them. No opportunity was given the other party or the public to subscribe until after Stevens had taken three hundred and fifty shares which was not only a majority of the new issue but gave him a majority of the whole. The effect was to enable him to control future elections, and thus by his own act, while his party were wrongfully filling office, to change the balance of power and the control of the corporation. There can be no reasonable doubt that this was the intent, though the court did not specifically find that fact, being of opinion that as such was the effect the intent was not material.

A ratification by the stockholders would have made the new issue valid, but the acts of the meeting on July 4, 1894, were not a ratification, because they were not a fair expression of the stockholders' will on the subject. No one was present but the de facto officers themselves, who knew their acts were objected to. The other stockholders were absent in consequence of an injunction issued by the court against holding the election which was the chief purpose of the meeting. It is true the injunction did not in terms prohibit the meeting for other purposes, but as every stockholder knew that the main business was the election which would terminate the long standing contest for control, they had fair justification for supposing that when the election was enjoined there remained nothing to do at the meeting but the formal routine to which no one attached any importance, and therefore for staying away. In view of the circumstances, a court of equity should not hold them bound by action sprung upon them, without notice, by the opposition who were thus accidentally in control of the meeting.

Reddig being apparently a bona fide purchaser without notice, the acts of the de facto board are binding on the corporation as to him, but his vendor, Stevens, was rightly prevented from

obtaining any advantage by his sale of the stock illegally issued to himself, by enjoining a corresponding number of votes on his old stock until the status of the new issue should be finally determined.

Inasmuch as the case goes back for such further proceedings as to the court below may appear to be just and equitable, it is neither necessary nor desirable that we should express any further opinion as to the merits of the controversy, or make any suggestion as to what further action should be taken.

As the case progresses to final hearing, questions that now appear to be worthy of notice may be eliminated from the case, and others of controling effect may arise. What we have said in justification of the interlocutory decree is predicated of the facts as they now appear from the record before us.

The appeal is therefore dismissed with costs to be paid by appellant; and it is ordered that the record be remitted to the court below for further proceedings.

Mr. Justice Dean, dissenting.

I most respectfully dissent from the opinion of the chief justice in this case. It assumes the decree is not final, but only has the effect of continuing the preliminary injunction, and deferring final judgment to be entered after further proceedings in the court below. This is a mistake; dismissing defendants' appeal now has, so far as concerns them, all the force of a final decree; ousts them from any control of the corporate property in which they have invested their money and hold a majority of stock, and places practically the whole in possession of plaintiffs, without the rights of stockholders on part of defendants. And so both parties in the oral argument before us admitted, and both assumed our decree would be in its effect, the end of the contention. Therefore, it seems to me, our duty now clearly is, to end the strife by reviewing the case on its merits, and passing on the questions which determine the parties' rights.

Aside from the purely technical question as to the legal ownership of the new issue of stock, no corporate mismanagement by defendants is found by the court below. The evidence clearly indicates, the property was wisely and economically managed to the best interests of all the stockholders, including

plaintiffs; they refunded the debt of the corporation by the issue and sale of 350 additional shares of stock. Assuming defendants were but managers de facto, plaintiffs had full information of the proposed corporate action on the 27th of September, 1892. I do not see how they could have had more particular or fuller information than that contained in the affidavit of A. A. Stevens, which it is admitted was read to A. G. Morris that day. Yet the first legal proceedings begun by plaintiffs after the notice were on the 27th of July, 1893, and the second, the filing of this bill, June 28, 1894, and this last is the only one which questions the legality of the additional issue of stock. It appears from the record, that plaintiffs waited more than twenty-one months after notice of the action of the de facto managers before they invoked the restraining power of the court. By that time, all the plans for refunding the corporate debt had been fully carried out; the corporation not only had received defendants' money for the new stock, but had spent it for the benefit of the corporation and these complaining stockholders. Plaintiffs now claim the issue of the stock and expenditure of the money were illegal, and ask a court of equity to restore the status. In my opinion the bill cannot be maintained, and this court ought, without hesitation, to so say. To do other than this, it seems to me, is to disregard well settled equitable principles. Ashhurst's Appeal, 60 Pa. 290, and Watt's Appeal, 78 Pa. 370, as well as numerous other cases, hold that as to an act of corporate directors, done with a bona fide intent of benefiting the corporation, the assent of the shareholders who knew of the act will be presumed if they do not gainsay it within a reasonable time; further, when the act involves a large expenditure of money the complaining shareholder must not only dissent, but is bound to promptly follow that up with active preventive measures. He must invoke the power of the courts; he cannot wait until the corporation has reaped the benefit of the alleged illegal act, and then call the officers of the corporation to account, for it is against good conscience that one having power to prevent, should stand by and see corporate managers spend money which may result to his benefit, and afterwards charge them with it. His neglect to act at the proper time effectually bars his right.

C. A. Morris, one of these plaintiffs, a director, was present

at several meetings of the board and dissented, but that was all; the others did not even dissent. After the stock is issued the money paid, and the corporation largely benefited, the plaintiffs ask that the holders of the stock be restrained from exercising under it the rights of bona fide stockholders, and our decree, in its effect, grants their prayer. In my opinion the only just decree we can make is to say they are too late, and direct the dismissal of their bill.