### VERNON H. BROWN & another *vs.* WINNISIMMET COMPANY.

If a company is incorporated with power to establish and maintain a ferry and to own and possess vessels, steamboats and other personal property not exceeding in value a certain amount, the court cannot say that a contract by the company to let one of its steamboats at a certain rate per day, to be used for no specified length of time and in no specified place, is in excess of its corporate powers, if there is no proof that the steamboat was not necessary or proper to be used in the prosecution of the business of the ferry, or that by reason of owning it the company exceeded the limits of property which it was authorized to hold.

If the treasurer of a ferry company agrees in its behalf to let one of its steamboats at a certain rate, with an agreement that if rechartered any surplus that may be received over the specified rate shall be divided between the company and the charterer, and the steamboat is accordingly rechartered at a higher rate, and the corporation allows it to go into the possession of the second charterer and remain in his use for several weeks, and after its return collects of such second charterer the sum which he promised to pay therefor and enters the same upon its books, this is sufficient evidence to authorize a jury to find a ratification by the corporation of the contract of the treasurer.

CONTRACT. The declaration was on an account annexed, one item being a charge of $1650 for " one half cash due and paid by the United States government for charter money of steam ferry-boat Winnisimmet, forty-four days at two hundred dollars per day, after deducting one hundred and twenty-five dollars to be retained by said company." The second item was a charge of $468.23 for cash paid by the plaintiffs for commission for procuring said charter, and interest.

At the trial in the superior court, before *Russell,* J., the plaintiffs put in evidence the following agreement:

" The Winnisimmet Company will charter their iron ferry-boat Winnisimmet at one hundred and twenty-five dollars per day free of all commissions to Brown & Wilde, they to recharter at highest obtainable rate, returning to said Winnisimmet Company one half of any excess received over one hundred and twenty-five dollars per day, now in perfect running order and ready to leave at a day's notice. N. Matthews, Treasurer. Boston, August 8, 1862."

The plaintiffs also contended that by a subsequent agreement the defendants promised to pay one half the commissions paid to a Philadelphia broker, provided the steamboat could be char tered for two hundred dollars a day.

At the time of making the above contract, it was understood that she was to be rechartered to the United States, for service in the war.

The plaintiffs then introduced testimony that, upon receiving said instrument, they employed brokers in Philadelphia through whom a charter was made of said vessel to the United States government at two hundred dollars per day : and that said vessel was by telegraph ordered to be sent instantly, without wait- ng for charter parties; that this was communicated to the treasurer of the defendants' corporation and the superintendent thereof, and the captain of the boat was sent to the plaintiffs to receive orders for her outfit and sailing instructions; that the plaintiffs gave such orders and instructions, superintended personally her outfit and cleared her at the custom-house for Fortress Monroe, there to report to the United States quartermaster;

and that said vessel sailed in the service of the United States on the 14th of August, and was retained forty-four days at the rate of two hundred dollars per day.

It was further in evidence that on the 30th of August 1862 the plaintiffs wrote to their said brokers in Philadelphia as follows:

" We received your telegram as follows, late last evening: ' Telegraph us whose names, and to whom payable charters steamers to be made.' We telegraphed to you to-day as follows: ' Winnisimmet owned by Winnisimmet Company, payable Nathan Matthews, boat valued $32,000.' "

On the return of the steamboat a charter party was necessary for the collection of the money for her service, and there was difficulty in making such collection, from the failure of the master to bring home proper vouchers or certificates for the service rendered by him, for which neglect the plaintiffs contended that the defendants were responsible.

No charter was executed until after the steamboat had left the service of the United States, but the charter was then made, from directions previously given by the plaintiffs, in the name of the defendants, and the charter money was payable to the order of the defendants' treasurer. The money, at the rate of two hundred dollars a day, was collected by the defendants and duly entered in their book, and the jury found specially that there was a subsequent implied agreement between the plaintiffs and the defendants by which the latter undertook to collect the money due from the government.

The defendants requested the court to rule that the above was not sufficient evidence to warrant the jury in finding that the defendants' treasurer was authorized to make the agreements under which the plaintiffs claim, or to find that the same had been ratified by the defendants. The judge instructed the jury that there was no evidence of antecedent authority, but that there was evidence which would justify them in finding that the agreements were ratified, and left the question of fact to them.

The defendants also requested the court to rule that the agree-ments relied on by the plaintiffs were not authorized by the

defendants' charter, and were void ; but the judge declined so to rule.

The jury returned a verdict for the plaintiffs, with $1887.31 damages ; and the defendants alleged exceptions.

*P. W. Chandler & G. O. Shattuck,* for the defendants. The contracts under which the plaintiffs claim were not within the power of the defendants. The corporation was created with power only to own such steamboats as were necessary to accommodate the public travelling between Boston and Chelsea, and this was an attempt to divert their boats from their regular and only authorized business. *St.* 1833, *c.* 197. A provision therein authorizing a sale was to enable them to sell the old boats of a former company. The laws are strict as to ferry companies. The object is twofold ; to secure good ferries, and to put this means of communication into the hands of responsible parties. The charter is the only authority under which a corporation can act. But here the treasurer undertook to take this boat off from the line, and charter it without restriction of place or use. If he or the company could do this, they might take off all the boats ; they might have chartered it to the czar of Russia or the emperor of China ; or they they might have gone into commercial enterprises generally, and chartered the boat to a merchant, to go to Savannah or New Orleans. Meanwhile, what would become of the inhabitants of Chelsea and the statutes of Massachusetts ? All of the provisions as to ferries would become utterly null. But a license to keep a ferry is not assignable. If they may let their boat for a short time, they may for six months. The defendants are not estopped to set up this defence. Angell & Ames on Corp. § 256. *Pennsylvania, &c. Steam Navigation Co.* v. *Dandridge,* 8 Gill & J. (Md.) 248. *Hood* v. *New York & New Haven Railroad,* 22 Conn. 502. *Harding* v. *Steamboat Maverick,* 5 Law Reporter, 106. *Pearce* v. *Madison, &c. Railroad,* 21 How. 441. Besides; this charter was plainly for the purpose of obtaining from the government an exorbitant price in time of war. Such a contract is void. It is said that this ground is not open to the defendants, because not taken at the trial ; but the objection was taken that the contract was void, and this is one reason why it was void.

If the corporation had power to make this contract, the treasurer had none. *E. Carver Co.* v. *Manuf. Ins. Co.* 6 Gray, 214. *Ashuelot Manuf. Co.* v. *Marsh,* 1 Cush. 507. Neither the company nor its officers could lease its boats. There is no resemblance between such an act and a sale of surplus stock or old boats. If the act was illegal, it cannot be ratified. It is said the defendants are liable because they have got the money. But it is a familiar rule as to executed contracts for unlawful purposes, that the law will not interfere. But there is no evidence of a ratification of the contract with the plaintiffs. We may admit that there was a valid contract with the United States; but the plaintiffs set up a contract to pay them. Where is the evidence of a ratification of that contract? There is no evidence that the officers of the company, except the treasurer and the master of the steamboat, knew that the plaintiffs had anything to do with it.

*E. D. Sohier & J. D. Bryant,* for the plaintiffs. The ruling of the judge that there was no evidence of antecedent authority in the treasurer to make these contracts was too favorable to the defendants. His execution of the agreement was *prima facie* evidence that the corporation was bound. *New England Marine Ins. Co.* v. *De Wolf,* 8 Pick. 56, 62, 63. *Hilliard* v. *Goold,* 34 N. H. 239. *Bank of United States* v. *Dandridge,* 12 Wheat. 64. The jury might infer original authority from the evidence of ratification. *Melledge* v. *Boston Iron Co.* 5 Cush. 179. *Thayer* v. *White,* 12 Met. 343. *Shaw* v. *Nudd,* 8 Pick. 12. *Amory* v. *Hamilton,* 17 Mass. 109. *Frothingham* v. *Haley,* 3 Mass. 70. There was ample evidence of ratification. *Hayward* v. *Pilgrim Soc.* 21 Pick. 275. *Episcopal Charitable Soc.* v. *Episcopal Church,* 1 Pick. 372. The contracts were not in violation of the defendants' charter. The occasional or incidental letting of a steamboat is an act, by necessary implication, within the scope of their corporate power. Angell & Ames on Corp. *c.* 8, § 12. The contracts are executed, and therefore the defendants cannot avoid their obligation on the ground that they had no authority to enter into it. *Allegheny City* v. *Mc Clurkan,* 14 Penn. State R. 83. *Bulkley* v. *Derby Fishing Co.* 2 Conn. 252, 258. *Moss*

*v. Rossie Lead Co.* 5 Hill, 137. *State of Indiana* v. *Woram,* 6 Hill, 33, 37. *Parker* v. *Boston & Maine Railroad,* 3 Cush. 117. *Proprietors of Quincy Canal* v. *Newcomb,* 7 Met. 276. *Chester Glass Co.* v. *Dewey,* 16 Mass. 94. *Little* v. *Obrien,* 9 Mass. 427.

BIGELOW, C. J. The main defence to this action appears to have been that the contracts or agreements on which the plaintiffs rely in support of their claim against the defendants were such that the latter had no power or authority to make them under the act of the legislature by which they were incorporated, and that they cannot for that reason be enforced in a court of law. The later English authorities seem to sanction the doctrine that such a ground of defence, although it may be "unbecoming and ungracious," or, in the stronger language of Lord St. Leonards, "indecent," is nevertheless legal and valid, if it be made to appear, either by the express provisions of an act of incorporation or by necessary and reasonable implication therefrom, that a contract which is sought to be enforced in an action at law against a corporation is beyond the scope of the powers granted by its charter; or, in other words, that the legislature did not intend that the body created by them should enter into contracts of a character like that which a plaintiff makes the foundation of a claim against it. *South Yorkshire Railway, &c.* v. *Great Northern Railway,* 9 Exch. 55, 85. *Bateman* v. *Ashton-under-Lyne,* 3 Hurlst. & Norm. 323. *Norwich* v. *Norfolk Railway,* 4 El. & Bl. 397, and cases cited. *Hawkes* v. *Eastern Counties Railway,* 1 De G., Macn. & Gord. 737, 760. A similar doctrine has been recognized and applied by courts in this country. *Pennsylvania, &c. Steam Navigation Co.* v. *Dandridge,* 8 Gill & J. 248. *Hood* v. *New York & New Haven Railroad,* 22 Conn. 502. *Pearce* v. *Madison, &c. Railroad,* 21 How. 441. Angell & Ames on Corp. § 256, and cases cited. It is on the principle which seems to be adopted by these authorities that the defendants rely to defeat the present action.

We have no occasion now to examine at length into the correctness of this doctrine, or to ascertain with precision its proper limitations or operation, because we are of opinion that the defendants do not bring the case at bar within any recognized

application of the rule. Looking only at the words of the act by which the defendants were incorporated, *St.* 1833, *c.* 197, we are unable to say that the contracts on which the plaintiffs rely are so far foreign to the object for which a charter was granted to the defendants as to require us to declare them to have been *ultra vires* and illegal, and that no action upon them can be maintained in a court of law. In the absence of all evidence of extraneous facts, and taking the case as it was presented at the trial, on a comparison of the contracts set up by the plaintiffs with the act incorporating the defendants, it appears to us that the scrupulous care and anxiety to keep within the limit of their corporate powers, which the defendants now manifest will not avail them in defence of this action, although it may induce them to exercise a greater caution in entering into contracts which they cannot fulfil without violating their charter. They were incorporated with power to establish, continue and maintain a ferry between the city of Boston and the town of Chelsea, and were authorized to own, hold and possess vessels, steamboats and such other personal property, not exceeding in value one hundred thousand dollars, as might be necessary and convenient for the better management of such ferry and of the affairs of said corporation. There can be no doubt that under this charter the main purpose for which the defendants were incorporated was to carry on the transportation of persons, vehicles, merchandise and other articles by means of a ferry across Charles River between the points designated in the act. All else was to be subordinate and incidental to this main design. So far, the argument urged in behalf of the defendants is sound and irrefragable.

But the next step is not so easily taken, nor does it lead to the point at which the defendants seek to arrive. It was not shown at the trial that the steamboat which was the subject of the contracts with the plaintiffs was not a necessary and proper vessel to be used by the defendants in the prosecution of the business of their ferry, nor that by reason of its ownership they had exceeded the limit of personal property which they were empowered by their charter to hold. Nor could it be

properly inferred that it was not reasonably required for the legitimate business of the corporation, because it was not in actual use by them on the ferry at the time the contract for letting it was entered into with the plaintiffs, and because it was chartered under that contract for the use of the government of the United States.  Such an inference could be made only on the theory that the defendants were so restricted by their charter that they could not hold any greater number of vessels or steamboats than were absolutely required for present or immediate and constant use on their ferry, or, if they could be allowed to possess a larger number, that they could not use or employ them in any other business or for any other purpose whatever, but must suffer them to remain at their wharf to decay or deteriorate for the want of use, or, at least, in a condition in which they could be of no advantage to themselves or others.  But we think such a narrow and restricted construction of the powers granted to the defendants is inconsistent with any reasonable view of the intention of the legislature in conferring on them a corporate franchise, and is not required by any considerations of justice or sound policy.  On the contrary, we cannot doubt that under their charter they are authorized to hold any amount or kind of personal property, within the limit of value fixed by the act, which they may deem necessary or expedient for the proper conduct and management of the business of the ferry ; that it is no excess of their corporate powers to own steamboats which are not required for immediate or constant use in the daily prosecution of their ordinary business, but which may be convenient or useful in case of sudden emergency or accident, or when those which are employed in the regular service of the ferry might be withdrawn for repairs ; that it is not necessary that such extra or additional steamboats should be kept unemployed when not required for the business of the ferry, but that it is competent for the defendants to use them or to let them to others to be used in carrying on any legitimate business for which they are suitable, such as the towage of vessels and the transportation of passengers or merchandise, so long as such use is only temporary and incidental to the main purpose for which they are owned by the defendants.

We know of no rule or principle by which an act creating a corporation for certain specific objects or to carry on a particular trade or business is to be strictly construed, as prohibitory of all other dealings or transactions, not coming within the exact scope of those designated. Undoubtedly the main business of a corporation is to be confined to that class of operations which properly appertain to the general purposes for which its charter was granted. But it may also enter into contracts and engage in transactions which are incidental or auxiliary to its main business, or which may become necessary, expedient or profitable in the care and management of the property which it is authorized to hold under the act by which it was created. For example, it might perhaps be held that a corporation established for the purpose of manufacturing cotton and woollen cloth could not properly invest all its capital in mill powers and privileges, and engage exclusively in the business of leasing them to others to be used for manufacturing purposes, or that it could not lawfully confine its operations to the making of steam-engines and machines for sale. But no one could doubt that it would be within the scope of its powers to allow another person or corporation, for a reasonable compensation, to draw surplus water from its mill-pond, or to employ that portion of its steam power which was not required for its own use. So a stage-coach company or a street railway corporation would exceed its corporate powers if it engaged extensively in the transportation of passengers and merchandise on land or sea by steam; but it would be acting strictly within the limits of its capacity if it should occasionally let a horse or a coach or car, not required for its own immediate purposes, to another person or corporation, or should enter into a contract for the employment of its horses in another occupation during a portion of the year when the business of the corporation did not require their use. We can see no substantial difference between transactions of this character and that which the defendants entered into when they made the contracts with the plaintiffs.

These views of the extent of the authority granted to the defendants by the legislature are a decisive answer to the defence

relied on by them at the trial. The steamboat, under the contract with the plaintiffs, was let to the United States in a season of great public exigency, for military purposes ; the defendants did not part with her control for any definite period of time, but only from day to day, nor did they send her to a great distance, where she could not be speedily recalled. The defendants retained the right and power to resume the possession and use of her at any moment. In this state of facts, we are of opinion that the court below took a correct view of the law, and was right in refusing to rule, as requested by the defendants, that the contracts entered into with the plaintiffs were not authorized by the defendants' charter, and were therefore void.

It was further objected on the part of the defendants, at the trial, that the evidence was insufficient to show that the treasurer of the corporation was authorized to enter into the agreement set up by the plaintiffs as the foundation of their claim, or that the agreement had been so ratified by the defendants as to be binding on them. On this point, the ruling of the court was sufficiently favorable to the defendants. The evidence of ratification was plenary, and well authorized the jury in finding the fact. Not only did the defendants allow the steamboat to continue in the employment of the United States for upwards of seven weeks, under the contracts made with the plaintiffs, without dissent or objection, but it is expressly found that the money under the charter party "was collected by the defendants and duly entered on their books," and that this money was collected by the defendants from the government under an agreement with the plaintiffs. It is difficult to see how a ratification could be more satisfactorily shown.

It was suggested at the argument that the contract between the parties for letting the steamboat to the United States was against public policy, and for that reason one under which the plaintiffs could not claim to recover. No such point seems to have been raised at the trial or ruled upon by the court. It is not, therefore, open on the exceptions. But we feel bound to say that we see no ground in the facts stated for any such assumption. It does not appear that the steamboat was let to the

government at an exorbitant price, or that any undue advantage was taken of the public officers or agents, in making the charter. We cannot in the absence of proof judicially infer that such was the fact. *Exceptions overruled.*