**Sol M. ZWEIFACH, Plaintiff,**

v.

**SCRANTON LACE COMPANY, First National Bank and Trust Company of Scranton, Harold J. Megargel, and J. D. Johnson, Defendants.**

Civ. A. No. 5822.

United States District Court
M. D. Pennsylvania.
Oct. 18, 1957.

Kennedy, O'Brien & O'Brien, Scranton, Pa., Jacob Rapoport, Francis J. Purcell, Joseph Rogers, New York City, for plaintiff.

Warren, Hill, Henkelman & McMenamin, Scranton, Pa., for defendant First Nat. Bank & Trust Co.

Charles Welles, III, James W. Scanlon, Scranton, Pa., for defendants Scranton Life Co., Harold J. Megargel and J. D. Johnson.

JOHN W. MURPHY, Chief Judge.

This is a diversity action, 28 U.S.C.A. § 1332(a) (1), wherein plaintiff, a citizen of New York, a shareholder and director [1] of The Scranton Lace Company, a Pennsylvania corporation having its principal office and place of business in this district, seeks to invalidate a contract between the corporation [2] and the Smith-Palmer Machine Corporation, of Illinois, whereby Scranton Lace assigned, transferred and delivered all of its remaining authorized [3] but previously unissued no par value common stock (82,197 shares) and 544 shares held as Treasury Stock to Smith-Palmer in exchange for all of the issued and outstanding Capital Stock of Southwest International Corporation, a Delaware corporation (142,093 shares 10¢ par value common stock of which Smith-Palmer was the sole owner [4]).

1. Elected by cumulative votes March 1956, Pennsylvania Business Corporation Law, Act 1933, May 5, P.L. 364, Art. V, § 505, 15 P.S. § 2852–505. The actual number of shares owned by plaintiff, proceeding on his own behalf, or by his associates, or who the associates actually are, is not clear. Various assertions are made as to "ownership", "control"— "more than 18,000 shares" in March 1956; more than 20% to or as much as 50,200 shares as of January 30, 1957. Defendant's president stated plaintiff did not own a substantial number of shares but admits for purposes of this action that the requisite jurisdictional amount is in controversy.

2. H. J. Megargel, President, and J. D. Johnson, Secretary, also directors. The First National Bank and Trust Company of Scranton, Pennsylvania, is Registrar of defendant company's stock.

3. By the shareholders, October 25, 1934. See Articles of Amendment, Art. VII, Act of 1933, Art. VIII, § 801, supra, 15 P.S. § 2852–801; Certificate December 26, 1934, Id. Sec. 2852–808. Total authorized, 190,000 shares—stated value $10 per share, all of one class. See § 5, Statement approved and filed October 19, 1939—number issued 107,803 shares, of which 544 shares were held as Treasury Stock.

4. The agreement was duly executed by Smith-Palmer; endorsed by S & P National Corporation, owner of all the issued and outstanding stock of Smith-Palmer; the certificate issued, ready for transfer and delivery, before the meeting of January 30.

Pursuant to a resolution duly approved and adopted at an annual meeting January 30, 1957, by nine of its ten directors [5] the corporation, through its executive officers, shortly after the directors meeting, executed the contract, issued the stock certificate, transferred it on the books of the company, and next morning had it registered.

Consolidated balance sheets were exchanged;[6] that of Southwest pro forma. Each represented they fairly reflected their financial position as of the date of closing. Each represented and warranted the respective shares and their authority to make the transfer. Each stipulated and agreed that the contract constituted a consummated transaction. However, to afford an opportunity to see that all representations and warranties were in accord with the facts, it was agreed that pending such examination the respective securities should be held by the General Counsel of Scranton Lace. If any question arose it should be submitted to arbitration and if the facts were not as represented and warranted recision would be the exclusive remedy. Meanwhile, each party was to have all the rights and incidents of ownership, including the right to vote thereon. See Act of 1933, supra, 15 P.S. § 2852–508.

Pennsylvania law controls as to the rights and obligations of the parties. Miller v. Tulsa Petroleum Co., D.C.M.D. Pa.1953, 117 F.Supp. 359, at page 360; Solomon v. Neisner Bros., Inc., D.C.M.D. Pa.1950, 93 F.Supp. 310, at pages 312, 313, affirmed 3 Cir., 187 F.2d 735; Robert H. Fox Co. v. Keystone Driller Co., 3 Cir., 1956, 232 F.2d 831, at page 834; Smith v. Onyx Oil & Chemical Co., 3 Cir., 1955, 218 F.2d 104, at page 110; Krauss v. Greenbarg, 3 Cir., 1943, 137 F.2d 569, at page 570; York Metal & Alloys Co. v.

Cyclops Steel Co., 1924, 280 Pa. 585, at page 588, 124 A. 752, at page 753.

The problem involved, including plaintiff's objections to the transaction will be more clearly understood if the matter is placed in its proper setting.

Organized for the purpose of "Manufacturing lace curtains and other textile fabrics" [7] the company prospered for many years. Because of a general decline in the lace business the number of plants in the United States was reduced to four. Although maintaining its relative position in the industry, Scranton Lace operations for several years were unprofitable, unexpectedly so in December 1956. To stem the tide, management tried unsuccessfully to diversify, to develop new and additional products, to provide maximum use of facilities, increase employment, and earn profits for the stockholders.

At his first directors' meeting plaintiff's request that North American Lace Company, one of the corporation's chief competitors, be permitted to inspect the plant, in the hope that they might lease all or part of it or consolidate their activities in Scranton, was refused, fearing it might be a harmful ruse to learn important trade secrets. In September, management after investigation advised the shareholders against submitting their shares in response to a request by Mica Corporation of Canada, Ltd., for tender of 25,000 shares at $27 per share. Only a few shares were tendered; none were purchased.

Meanwhile, the market price for shares increased considerably because of plaintiff and his associates' activities and efforts to increase their proportionate ownership or control.

November 28, absent evidence of any such pending program, plaintiff telegraphed that he opposed (a) a long term

---

5. The eleventh director was out of town on business.

6. Of Scranton Lace and its wholly owned subsidiary, Craftspun Yarns Inc.; of Southwest, Willet Corporation, Kraftville Corporation.

7. June 15, 1897, Act 1874, April 29, § 2 as amended and supplemented, 15 P.S. § 2, "The Scranton Lace Curtain Co.", name changed February 3, 1917, Act 1903, April 22. Articles of Amendment under the Act of 1933, supra, Note 3.

management contract; (b) stock purchase options; (c) employee profit sharing plans; that the Board of Directors as then constituted could not evaluate them properly; that they should be submitted for stockholders' approval and if necessary he would convene a special meeting of shareholders. Mr. Megargel advised that if (b) and (c) were ever considered stockholders' approval would be sought. Plaintiff's brief suggests that because the reply failed to mention (a), plaintiff on December 10 announced formation of an independent stockholders committee to function as a "watch dog" until the annual stockholders' meeting in March 1957, and that meanwhile representatives of the holders of well over 25% of the outstanding stock were requesting that a special meeting be held in accordance with the By-Laws. Finally plaintiff stated, "I have always maintained that a carefully supervised diversification program which would make use of the excess productive capacity available would benefit all concerned."

Plaintiff's demand, December 11, that the secretary call a special meeting of shareholders to oust the Board of Directors was on December 16 refused, citing the Act of 1933 and the By-Laws. (As to Special Meetings, see 15 P.S. § 2852–501(c); By-Laws; Acts 1933, 1949, 1951, 15 P.S. § 2852–402(1), 405; Defendant corporation's By-Laws Art. II, §§ 2, 4, 6; Art. IV, § 1, and cf. Id. § 2.) See Ballard, Participation in Corporate Management Under the Pennsylvania Business Corporation Law, 25 Temple L. Quarterly 131 at 135.

About that time management contacted David Milton and his associates of The Equity Corporation. An Executive Committee of three directors named by the Board of Directors (15 P.S. § 2852–402(6), explored possibilities.

To ascertain what if any plans plaintiff and his associates had for the company and its future, Mr. Megargel arranged a meeting for January 4 in New York and named a Special Committee of two directors (15 P.S. § 2852–406; By-Laws Art. V, § 6) to aid the Executive Committee and to attend the New York meeting. All parties present were opposed to liquidation. Plaintiff complained that one of his associates was not named to fill a recent vacancy on the Board. No one present had any particular solution to offer for the pending problem.

Upon returning to Scranton meetings were arranged and held between the Executive and Special committees and the Milton group, the last one about a week before the annual meeting.[8] Meanwhile the Executive Committee met almost daily examining a proposal submitted by the Milton group, investigating the assets, studying balance sheets and statements of profit and loss, published statements, Dun and Bradstreet reports,[9] consultations with brokers, checking security values and quotations, inquiring as to the status and reputation of David Milton and his associates and The Equity Corporation and interrelated companies.

About January 24, the Executive Committee after careful, serious, extensive and intensive investigation, and the Special Committee decided that the proposal should be favorably reported to the Board of Directors at the annual meeting of January 30. Meanwhile all of the directors except plaintiff were advised generally as to the proposal. See and cf. Markovitz v. Markovitz, 1939, 336 Pa.

---

8. January 20, notice of the annual meeting did not mention the proposal then being investigated. See Act 1933, 15 P.S. § 2852–404; By-Laws Art. IV, § 6; Evans v. Hofacker, 1953, 15 Beaver, Pa., 134; Vol. 2 Fletcher Cyclopedia of Corporations, 1954 Rev. Vol. § 414 at p. 266; 13 Am.Jur. Corporations, § 951; In re Redstone Tp. School Dist., 1925,

284 Pa. 325, at pages 328, 330, 331, 131 A. 226, at pages 227, 228, and see and cf. Mercantile Library Hall Co. v. Pittsburg Library Ass'n, 1896, 173 Pa. 30, at pages 39–40, 33 A. 744, at page 746; In re Lone Star Shipbuilding Co., 2 Cir., 1925, 6 F.2d 192, at page 195.

9. In these instances 1956 statements were not yet available.

145, at page 150, 8 A.2d 46, at page 48, 124 A.L.R. 359; Hunsicker & MacIntosh v. Reading Laundries, Inc., 1936, 26 Pa. Dist. & Co. R. 215, at page 220; Ringler v. Atlas Portland Cement Co., 1930, 301 Pa. 176, at page 178, 151 A. 815; Halpern v. Grabosky, 1929, 296 Pa. 108, at page 112, 145 A. 834, at page 835.

The Milton group was advised of the favorable reaction. Over a period of two or three days a proposed contract and resolution were prepared by Smith-Palmer's New York counsel. About 9:30 A.M. January 30, New York counsel brought the unilaterally executed proposed contract and resolution to the office of defendant's General Counsel (a director and member of the Special Committee). After several hours discussion the proposed contract and resolution were approved as to form and legal sufficiency. Mr. Megargel was so advised.

Immediately before the annual meeting on January 30, plaintiff suggested a later meeting with Mr. Megargel to agree on a mutually satisfactory Board of Directors and assured him that none of the executive personnel would be disturbed.

During the negotiations with Smith-Palmer when asked what representation they would expect on the Board of Directors, the Smith-Palmer people suggested two. Nothing was said as to names; nothing as to what would happen to those already on the Board, nor as to the executive personnel; only that diversification would increase employment and promote maximum use of facilities.

The proposed contract was presented and discussed in detail. Plaintiff's request for a week's delay being denied, he voiced his opposition to the project and walked out of the meeting. Before leaving plaintiff was asked if he had any suggestions to offer to provide much

needed diversification. He had none. The proposed contract was thereafter approved and adopted. The time of execution was fixed to occur immediately thereafter. The certificates were endorsed, transferred, registered, exchanged, and delivered into the hands of the "escrow" agent. In accordance with historic company policy, the provisions of the By-Laws and the Pennsylvania Business Corporation Law, Act of 1933, 15 P.S. § 2852–1 et seq., the transaction i. e., the issuance and sale of the stock, was not first submitted to the shareholders for their prior approval or later ratification before being put into effect.

February 1, plaintiff and his associates, purporting to represent more than 20% of the prior outstanding shares, called a meeting of shareholders as of February 11, 1957, to oust the present board of directors. Counsel stipulated and agreed that the meeting be cancelled; that the annual meeting of shareholders set for March 26 be postponed; that the case be considered on the merits, and a decree entered defining the rights of the respective parties. Plaintiff's counsel stated there was no one in their group who did not believe some action was necessary; but that they objected to the "precipitous" action herein taken, and that the whole transaction was invalid.

Southwest is a holding company represented as having fixed assets of $1,-789,000 net and miscellaneous investments of $2,040,000; net worth $2,154,-000. Among its holdings are: 210,892 shares of Common Stock of Sterling Precision Corporation; 90,340 shares Preferred Stock of The Mount Vernon Company; 12,700 shares Common Stock of The Van Dorn Iron Works Company; 21,153 shares of Common Stock of Balcrank Inc.;[10] a property at Dobbs Ferry,

10. Less than a majority in each instance. David Milton, President of the Equity Corporation, is a director of Sterling, Mount Vernon, and Balcrank; associated with Holly Corporation. A proposed merger of Sterling with Equity General Company; a reorganization of Mount Vernon are pending before the Securities & Exchange Commission. Holly seeks to acquire Mount Vernon and Van Dorn. Mount Vernon owes $1,205,284 Federal income taxes for prior years. Secured by mortgages, the debt is being reduced $6000 monthly.

New York, under lease to Columbia University, net annual rental $90,000; a property at St. Louis, Missouri, rented to Herman Body Company at $60,000 per year.[11]

All four companies manufacture various products. Of particular interest to Scranton Lace, a subsidiary of Sterling has a fibre glass and plastics division; Van Dorn manufactures inter alia plastic pipe fillings, fabrications and injected molded products; Balcrank, inter alia, aluminum tubing.

In the opinion of the Board of Directors all of these items suggest the possibility of adaptation, providing much needed diversification and maximum realization of plant and equipment essential if the company is to continue to operate and make a profit. Mr. Megargel stated at the meeting that this transaction could and he expected would lead to other steps which would actually accomplish that result. Defendant's general counsel testified the company's future was discussed with Mr. Milton and that additional steps were contemplated. The executive committee reported "Potentials: The character of assets of both Corporations involved in the initial transaction is not one intended to produce important earnings or growth potential; but rather by the combination, strong sponsorship and a base of sufficient strength can be produced from which negotiations with desirable earning situations can be successfully made which Scranton Lace, on its own, cannot achieve."

An examination of the files and correspondence introduced by plaintiff's counsel en masse, see and cf. United States v. Michener, 3 Cir., 1945, 152 F.2d 880, at page 885; Oxford Paper Co. v. United States, Ct.Cl.1931, 52 F.2d 1008, at page 1010; Id., 1932, 56 F.2d 895, at page 896, 74 Ct.Cl. 295, at page 301, indicates the possibility of a future increase in capitalization, issuance of preferred stock, possible merger, reorganization.

Defendant's counsel concedes that an increase in indebtedness or capitalization, see Art. XVI, § 7, Pennsylvania Constitution; Act of 1933, supra, 15 P.S. § 2852–309, Id. 801(4); creation of preferred stock, Id., Schaad v. Hotel Easton Co., 1952, 369 Pa. 486, at pages 492, 495, 87 A.2d 227, at pages 230, 231; Metzger v. George Washington Memorial Park, Inc., 1955, 380 Pa. 350, 110 A.2d 425; merger, 15 P.S. § 2852–901 to 908 inclusive, see Temperance Mut. Ben. Ass'n v. Home Friendly Soc., 1898, 187 Pa. 38, at page 47, 40 A. 1100; dissolution, § 2852–1102 to 1105, and cf. Weisbecker v. Hosiery Patents, Inc., 1947, 356 Pa. 244, 51 A.2d 811; or reorganization would require stockholder approval.[12] But contends that shares already authorized—absent any provision in the By-Laws to the contrary—could be issued without additional stockholder approval. See Act of 1933, supra, 15 P.S. § 2852–601, "Unless the articles or by-laws otherwise provide, the board of directors shall have the power, by resolution duly adopted, to issue from time to time, in whole or in part, the kinds or classes of shares authorized in the articles." And see By-Laws, Art. VI, granting such authority. 15 P.S. § 2852–318; By-Laws, Art. IV, § 7.

Article XVI, § 7 supra, also provides: "No corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void"; the Act of 1933, supra, 15 P.S. § 2852–603, "Shares of a business corporation shall

---

11. Herman is owned by the Jerry O. Mahoney Company. The American Stock Exchange is reported as having suspended trading in securities of the latter for failure to supply financial statements. Defendant states in the event of a vacancy the property may readily be leased to another and that cancellation of the other lease was most unlikely in view of the investment involved. There was no independent appraisal or title search of either property.

12. The contract was entitled "Agreement and Plan of Reorganization". Defendant's counsel contends and we agree that the latter was surplusage.

not be issued except for money, labor done, or money or property actually received * * * " The Constitutional provision is not self-executing, Bradford County Telephone Co. v. Young, 1938, 329 Pa. 433, at page 436, 198 A. 96, at page 97; Yetter v. Delaware Valley R. Co., 1903, 206 Pa. 485, at page 488, 56 A. 57, at page 97, and since the Act of 1933, supra, there has been no implementing statute, Grafton v. Masteller, 3 Cir., 1956, 232 F.2d 773, at page 775. "The constitutional and statutory provisions * * * were designed to prevent unscrupulous persons from fraudulently issuing and placing on the market * * stock not fairly representing money or property received by the corporation." Big Spring Elec. Co. v. Kitzmiller, 1920, 268 Pa. 34, at page 38, 110 A. 783, at page 784; cf. Memphis & L. R. R. Co. v. Dow, 1887, 120 U.S. 287, at pages 297, 298, 7 S.Ct. 482, at pages 486, 487, 30 L.Ed. 595. "The prohibition is not escaped through the receipt of some property or money if the amount or value is inadequate." McCandless v. Furlaud, 1935, 296 U.S. 140, at page 161, 56 S.Ct. 41, at page 48, 80 L.Ed. 121; In re Wyoming Valley Ice Co., 1907, D.C.M.D.Pa., 153 F. 787, at pages 793, 794, affirmed sub nom, Wiegand v. Albert Lewis Lumber & Mfg. Co., 1908, 158 F. 608, at page 610. " * * * all that is required is that transactions involving the disposition of corporate securities must be bona fide, and not a mere device to evade the law and impose a greater obligation * * * than there is any occasion for it to assume, in order to obtain the consideration received therefor." Houghten v. Restland Memorial Park, Inc., 1942, 343 Pa. 625, at page 633, 23 A.2d 497, at page 501, and see Grafton v. Masteller, supra, 232 F.2d at page 776. "The significant fact is whether the corporation received a real and bona fide consideration," In re Mifflinburg Body Co., 3 Cir., 1942, 127 F.2d 59, at page 61. See Commissioners Note to § 20, Model Business Corporation Act, 9 Uniform Laws Annotated, pp. 94–95.[13] And we add, that the valuation was made in good faith. See Krebs v. Oberrender, 1922, 274 Pa. 154, at page 159, 118 A. 19, at page 21; see 25 Temple L. Quarterly, supra, at 150.

There is no inherent incapacity of a corporation to purchase property and pay for it by stock, Shannon v. Stevenson, 1896, 173 Pa. 419, at page 421, 34 A. 218, nor to prevent payment in advance for property to be furnished. Id., and see Bole v. Murray, 1912, 233 Pa. 589, at page 595, 82 A. 943, at page 945, and see Grafton v. Masteller, supra, 232

---

13. § 2852–603 also provides, "Subscriptions for shares having no par value, which are made after incorporation, shall be made payable with consideration of the character and value determined by the shareholders at any annual or special meeting duly called and held for that purpose, or determined by the board of directors, acting under authority conferred by the shareholders or by the articles of the corporation." After approval by the shareholders the Articles of Amendment declared the stated value to be $10 per share.

As to Treasury Shares, see Id., "Shares of a corporation issued and thereafter acquired by it may be disposed of by the corporation for such consideration as may be fixed from time to time by the board of directors." See Provident Trust Co. of Philadelphia v. Crouse, 1941, 40 Pa.Dist. & Co.R. 628, at pages 631, 632: "It is apparent that the legislature intended to set up a flexible rule to meet varying situations. Market value, par value, book value, etc., none of these is necessarily a limitation upon the action of the directors. The value of treasury shares under this rule is within the discretion of the directors, acting presumably in each situation for the best interests of the corporation." And see Eckert v. Standard Chair Co., 31 Erie, Pa., 192, Id., 241. And see Id. § 2852–603, "For the purpose of determining whether shares have been fully paid for, in order to fix the extent of the outstanding obligation of a shareholder to the corporation with respect to such shares, the value placed by the incorporators, the shareholders, or the board of directors, as the case may be, upon the consideration, other than cash, with which the subscriptions for shares are made payable, shall be conclusive"; i. e., absent fraud, see Schmidt v. Paul, 1954, 377 Pa. 377, at page 385, 105 A.2d 118, at page 122.

F.2d 773. Section 2852–302 provides, "Subject to the limitations and restrictions contained in this act or in its articles, every business corporation shall have power: * * * (6) Whenever appropriate to enable it to accomplish any or all of the purposes for which it is organized, to guarantee, purchase, take, receive, or otherwise acquire, hold, sell, assign, transfer, mortgage, loan, pledge, or otherwise dispose of, and otherwise use and deal in and with the shares, bonds, securities, and other evidences of indebtedness of any other domestic corporation or of any corporation formed under any laws other than those of this Commonwealth, and, while the owner of the same, to exercise all the rights, powers, or privileges of ownership, including the right to vote thereon." [14]

Section 2852–302 concludes as follows: "The powers herein enumerated shall not be construed as limiting or enlarging the grant of authority hereinbefore made by this article, or as a limitation on the purposes for which a corporation may be organized. It shall not be necessary to set forth any of such enumerated powers in the articles of the corporation. Except as otherwise provided in this act or in the articles or in the by-laws, the powers herein enumerated shall be exercised by the board of directors of the corporation." [15]

As to the corporate purpose [16] [or purposes, see Act of 1933, § 2852–3A, § 2852–201; Pennsylvania Constitution, Article 16, § 6; Act of 1933, § 2852–301] see Moore v. Keystone Macaroni Mfg. Co., 1952, 370 Pa. 172, at pages 176, 178, 87 A.2d 295, at page 298, 29 A.L.R.2d 1256. " * * * where the action of a board of directors * * * is an abuse of discretion, or is forbidden by statute or is against public policy, or is ultra vires, or is a fraud upon minority stockholders or creditors, or will result in waste, dissipation or misapplication of the corporate assets, a court of equity has the power to grant appropriate relief."

■■ The transaction must be reasonably germane to the accomplishment of the objects for which the corporation was incorporated. The words of the charter are not to be given too narrow or literal a construction. The fundamental object of the corporation was to make a profit. See and cf. Malone v. Lancaster Gas Light & Fuel Co., 1897, 182 Pa. 309, at page 321, 37 A. 932, and see Id., 182 Pa. at page 322, 37 A. at page 933, "Where the act questioned is of a nature to be fairly considered incidental or auxiliary to such business, it will not be

14. As to prior statutes, see 15 P.S. § 661; Wrightsville Hardware Co. v. McElroy, 1916, 254 Pa. 422, at pages 429–430, 98 A. 1052, at page 1054; Illoway v. Daly, 1916, 65 Pa.Super. 333, 336; 15 P.S. § 131.

Section 2852–302 also provides power "(13) To enter into any obligation necessary for the transaction of its affairs. (14) To have and exercise all of the powers and means necessary or essential to effect the purpose or purposes for which the corporation is organized."

15. See and cf. § 2852–311, "A. The sale, lease, or exchange of all, or substantially all, the property and assets of a corporation, when made in the usual and regular course of the business of a corporation, may be made upon such terms and conditions, and for such considerations, which may consist in whole or in part of money or property, real or personal, including shares, or bonds, or other evidences of indebtedness of any other corporation, domestic or foreign, as shall be authorized by its board of directors. In every such case, no authorization or consent of the shareholders shall be required." But see contra, "B. * * * If not made in the usual and regular course of its business * * *". See Halpern v. Grabosky, supra, 296 Pa. at page 112, 145 A. at page 835.

16. "No corporation shall engage in any business other than that expressly authorized in its charter * * *" Pennsylvania Constitution, Art. 16, § 6.

"A business corporation shall have the capacity of natural persons to act, but shall have authority to perform only such acts as are necessary or proper to accomplish the purpose or purposes for which it is organized, and which are not repugnant to law." 15 P.S. § 2852–301.

unlawful because not within the literal terms of the corporate grant." See Com. ex rel. Baldrige v. Philadelphia Elec. Co., 1930, 300 Pa. 577, 151 A. 344; Delaware, L. & W. Ry. Co. v. Welser, 1911, 233 Pa. 154, at page 161, 81 A. 994, at page 997. "The true test in all such cases is the good faith of the transaction. Was the purchase made to accomplish an object falling within the general purpose and scheme of the corporation? If so, it would be a legitimate exercise of power. It would be otherwise only were it a clear attempt to enlarge the operations of the corporation, so as to embrace more than the charter contemplates." Id., 233 Pa. 162, 81 A. 997. And further, quoting from Bigelow, C. J., in Brown v. Winnisimmet Co., 93 Mass. 326, "Undoubtedly the main business of a corporation is to be confined to that class of business which properly appertain to the general purposes for which the charter was granted. But it may also enter into contract, and engage in transactions which are incidental or auxiliary to its main business, or which may become necessary, expedient, or profitable in the care and management of the property which it is authorized to hold." " 'Corporations may transact, in addition to their main undertaking, all such subordinate and connected matters as are, if not essential, at least very convenient, to the due prosecution of the former.' " American Coat, Apron & Towel Supply Co. v. Grant Building, Inc., 1931, 102 Pa.Super. 373, at page 381, 157 A. 52, at page 55.

■ Generally an escrow takes effect from the second delivery, title not being perfected until the happening of the condition. Baum's Appeal, 1886, 113 Pa. 58, at page 65, 4 A. 461, at page 462; Angelcyk v. Angelcyk, 1951, 367 Pa. 381, at pages 384, 385, 80 A.2d 753, at pages 755, 756; Weisenberger v. Huebner, 1919, 264 Pa. 316, at pages 318, 320, 107 A. 763, at page 764. One must be careful however to distinguish between an escrow and an escrow agreement. See Angelcyk v. Angelcyk, supra, and 30 C.J.S. Escrows § 4, p. 1194, "To consti-

tute an instrument an escrow it must be deposited with the intention that it shall take effect on the performance of an express condition or the happening of a certain event, and, as such condition or event is what differentiates an escrow from a completely executed instrument, as a deed, bond, or note, the condition must be one in fact which will prevent the operation of the instrument until it it performed." "The condition named may be either one precedent or subsequent to passage of title to the matter in escrow depending entirely on the intention of the parties to the agreement." Id., p. 1195. See Black's Law Dictionary, 3d Ed., p. 680, "The state or condition of a deed which is conditionally held by a third person, or the possession and retention of a deed by a third person pending a condition; as when an instrument is said to be delivered 'in escrow'. This use of the term, however, is a perversion of its meaning."

■ "The time when title passes may in a proper case be controlled by the manifest intention of the parties to the escrow agreement. The instrument will take effect according to the agreement of the parties where no intervening rights are injuriously affected." 30 C.J.S. Escrows § 13, p. 1217. "In all cases the question whether an instrument placed with a third person is to be an escrow or a completely executed instrument depends on the intention of the parties." 19 Am.Jur. Escrows, § 4, p. 421; County of Calhoun v. American Emigrant Company, 1876, 93 U.S. 124, at page 127, 23 L.Ed. 826. The depositary is generally considered to be an agent for both parties and is bound by the terms of the agreement. Paul v. Kennedy, 1954, 376 Pa. 312, at page 315, 102 A.2d 158, at page 159.

■ In the present case the parties agreed that title should actually pass. We see no reason why that intention could not be carried into effect notwithstanding the certificates were temporarily in the custody of another. See, for instance, Com. ex rel. Langdon v. Patterson, 1893, 158 Pa. 476, at page 494, 27

394

A. 998, at page 999, for an analogous situation.

■ The transaction was not a public offering and therefore not subject to the provisions of § 5 of the Securities Act of 1933, 15 U.S.C.A. § 77e; see Id. § 77d; Campbell v. Degenther, D.C.W.D. Pa.1951, 97 F.Supp. 975, at page 978; Securities and Exchange Comm. v. Ralston Purina Co., 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494.

As to dilution of plaintiff's voting rights, see Drinker "The Preemptive Right of Shareholders to Subscribe to New Shares", 43 Harv.L.Rev. 586. As to the general rule, see Vol. 11, Fletcher's Cyclopedia, Corporations, Perm.Ed., § 5135. Where the consideration is property, see Fletcher, Id. § 5136; 52 A.L.R. 220, at page 234, 138 A.L.R. 526, at page 533. As to authorized but previously unissued shares and treasury shares, see Fletcher, Id. § 5160, pp. 310, 312; 52 A.L.R., supra, 138 A.L.R. at page 534.

Non constat prior Pennsylvania law, see Reese v. Bank of Montgomery County, 1855, 31 Pa. 78; cf. Curry v. Scott, 1867, 54 Pa. 270, at page 276, and see Shellenberger v. Patterson, 1895, 168 Pa. 30, 31 A. 943; Morris v. Stevens, 1897, 178 Pa. 563, 568, 578–579, 36 A. 151; Electric Co. of America v. Edison Elec. Illuminating Co., 1901, 200 Pa. 516, 520, 50 A. 164; Hoyt v. Shenango Valley Steel Co., 1903, 207 Pa. 208, 56 A. 422; Glenn v. Kittanning Brewing Co., 1918, 259 Pa. 510, 513 et seq., 103 A. 340, L.R.A.1918D, 738, Ann.Cas.1918D, 769; 15 P.S. § 137; § 611 of the Act of 1933, 15 P.S. § 2852–611, provides, "Unless otherwise provided in its articles, a business corporation may issue shares, option rights or securities having conversion or option rights, without first offering them to shareholders of any class or classes." The present articles contained no contrary provision. See 25 Temple L. Quarterly, supra, at 148.

■ Apart from any pre-emptive or preferential rights which stockholders may or may not have, they have additional rights with respect to the issuance of shares, which rights arise out of the fiduciary or trust relation which directors and officers sustain to stockholders, which imposes upon directors and officers as fiduciaries the duty not to use their position for their own personal advantage or for that of their confederates, or to the detriment of stockholders. See 11 Fletcher, op.cit. supra, § 5160, p. 317. The distinction between this right based on equitable grounds and the pre-emptive rights is clearly pointed out in 43 Harv. L.Rev., supra, 586, and see Id. at 599. Very few of the cases involving the doctrine of pre-emptive right do not also involve "either a deliberate attempt by the directors, for their own benefit, to wrest the control from the majority shareholders (see Glenn v. Kittanning Brewing Co., supra, 259 Pa. 510 [103 A. 340]; cf. Dickinson v. Heller Bindery, 45 [Pa.] D[ist]. & C[o.R.]. 394; Eckert v. Standard Chair Co., supra, 31 Erie, [Pa.,] 192, Id., 241; Chrisman v. Avils, Inc., 1952, 80 D. & C. 395, at [pages] 411–412; Hunsicker v. Reading Laundries, Inc., supra, 26 [Pa.] D[ist.]. & C[o.R.]. at [page] 220; 25 Temple L. Quarterly, supra, at 148, 149), or an attempt to deprive the complainants of a substantial interest in the surplus and potential earnings by arbitrarily denying them a right to subscribe to new shares issued at substantially less than their admitted book and market value (Bank of Montgomery v. Reese, 26 Pa. 143, [Reese v. Bank of Montgomery] 31 Pa. 78, supra). The cases of the two latter classes required no new doctrine as a basis for their decision. All involved an obvious breach of the duty of the directors as fiduciaries and would have been similarly decided irrespective of any distinct common law doctrine of pre-emptive right. The first group are all flagrant breaches of trust. The second, on analysis, are found to belong to the same class. Where new shares are issued for substantially less than they are presently worth, the arbitrary exclusion of some shareholders from the right to participate, must, in almost every case, be predicated on an improper motive." 43 Harv.L.Rev. su-

pra, Id. (Citations in parenthesis supplied.)

Twice before the annual meeting plaintiff offered to buy the shares of the other directors at $27 per share, while the market price stimulated by plaintiff and his associates' activities was at best $24. All such offers were rejected—stating they would not be considered unless all the stockholders were treated on equal terms. At the hearing in an attempt to distort Mr. Megargel's reaction to the offer, plaintiff submitted in evidence a copy of a non-existing letter. Defendant suggests application of the "clean hands" doctrine should preclude further consideration of plaintiff's claim. Evidence of such misconduct tends to show plaintiff's unwillingness to rely on the truth of his cause. United States v. Katz, D.C.M.D.Pa., 1948, 78 F.Supp. 435, at page 438, affirmed 3 Cir., 1949, 173 F.2d 116; McHugh v. McHugh, 1898, 186 Pa. 197, 40 A. 410, 41 A.L.R. 805, 65 Am.St.Rep. 849. The equitable maxim that "he who comes into equity must come with clean hands" is a sound rule of equity and common honesty. Wrightsville Hardware Co. v. McElroy, 1916, 254 Pa. 422, at page 429, 98 A. 1052, at page 1054. " * * * far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, at page 814, 65 S.Ct. 993, at page 997, 89 L.Ed. 1381; Hick v. Peoples-Pittsburgh Trust Co., 1940, 340 Pa. 248, at page 252, 16 A.2d 718, at page 720; McVey v. Brendel, 1891, 144 Pa. 235, at page 249, 22 A. 912, at page 915, 13 L.R.A. 377; Hoffman's Appeal, 1935, 319 Pa. 1, at page 7, 179 A. 38, at page 41.

"No principle is better settled * * *" and he must " * * * keep them clean throughout the course of the litigation, * * * if he violates this rule, he must be denied all relief whatever may have been the merits of his claim." Root Refining Co. v. Universal Oil Products Co., 3 Cir., 1948, 169 F.2d 514, at pages 534, 535.

The Act of 1933, § 2852–401, provides: "The business and affairs of every business corporation shall be managed by a * * * board of * * * directors * * *"; and see By-Laws, Article IV, § 1. See Severance v. Heyl & Patterson, Inc., 1936, 123 Pa.Super. 553, at page 559, 187 A. 53, at page 56: "The board is the central power which authorizes the executive agents of the corporation to transact business for it, enter into contracts, and embark upon new adventures." And see Id., 123 Pa.Super. at pages 563, 564, 187 A. at pages 57, 58. "It is a general rule that the management of corporate affairs is within the discretion of the proper officers of the corporation, and this discretion, when not abused, is not to be interfered with by the courts * * *" Barnes Foundation v. Keely, 1934, 314 Pa. 112, at page 123, 171 A. 267, at page 271. "Officers or directors of a corporation are not personally liable for honest mistakes in judgment when doing acts within their discretion, even though such mistakes show absence of reasonable care; they are liable only where they are grossly negligent or fraudulent." Stone v. Schiller Bldg. & Loan Ass'n, 1931, 302 Pa. 544, at page 555, 153 A. 758, at page 761; Spering's Appeal, 1872, 71 Pa. 11, at page 20 et seq.

" 'The directors of a corporation are required to exercise reasonable and ordinary care, skill, and diligence in conducting its business, and the failure to observe this standard of care imposes liability on a defaulting director;' Fell v. Pitts, 263 Pa. 314, 319, 106 A. 574, 575; that is, the care, skill and diligence which the ordinary prudent man would exercise in similar circumstances. * * *" Hunt v. Aufderheide, 1938, 330 Pa. 362, at page 366, 199 A. 345, at page 347; see Otis & Co. v. Pennsylvania R. Co., D.C.E. D.Pa.1945, 61 F.Supp. 905, at page 910, affirmed 3 Cir., 1946, 155 F.2d 522;

Gamlen Chemical Co. v. Gamlen, D.C. W.D.Pa.1948, 79 F.Supp. 622, at page 631.

The Act of 1933, 15 P.S. § 2852–408, supra, provides: "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation, and shall discharge the duties of their respective positions in good faith and with that diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in their personal business affairs."

"The fiduciary character of the directors' relation to the corporation and the measure of their responsibility are quite different from those of a trustee under a will or a deed * * *; shares of stock are taken with notice that the assets shall be employed in making a profit, and that it is customary to take business risks." Hunt v. Aufderheide, supra, 330 Pa. at pages 376–377, 199 A. at page 352. See Carr-Consolidated Biscuit Co. v. Moore, D.C.M.D.Pa.1954, 125 F. Supp. 423, at page 433, note 28.

"* * * under normal circumstances a shareholder, director or officer of a corporation has the untrammeled right to purchase for his own use and benefit further stock in the corporation. See Bisbee v. Midland Linseed Products Co., 8 Cir., [1927] 19 F.2d 24, at page 27 * * *" Howell v. McCloskey, 1953, 375 Pa. 100, at page 107, 99 A.2d 610, at page 613; 3 Fletcher op.cit. supra § 900. A situation may however exist which makes it inequitable for an officer or director to buy the stock in question. See Bisbee v. Midland Linseed Products Co., supra, 19 F.2d at page 27; 3 Fletcher Id. §§ 1167–1169.

As a stockholder one has the right to manage his own property as he sees fit, but "a director is a trustee" for the stockholders and "good morals and good law" imperatively demand a higher standard. Bird Coal & Iron Co. v. Humes, 1893, 157 Pa. 278, at page 287, 27 A. 750, at page 752, 37 Am.St.Rep. 727. "* * * though one who is a director may sell his stock and keep any profits so acquired yet, under the guise of this rule, he cannot, in combination with others, even by means which if standing alone would be lawful in themselves, take advantage of his official position for his individual profit to the detriment of his corporation or its other stockholders." Porter v. Healy, 1914, 244 Pa. 427, at pages 435–436, 91 A. 428, at page 431; Commonwealth Title Ins. & Trust Co. v. Seltzer, 1910, 227 Pa. 410, at page 417, 76 A. 77, at page 79; Hill v. Frazier, 1853, 22 Pa. 320, 324. "* * * his official position is not his individual property in any sense, and he has no right, either directly or indirectly to use it for his own selfish ends * * *" 244 Pa. at page 437, 91 A. at page 432. "* * * or reaping personal benefit to the detriment of the stockholders whom he represents." Glenn v. Kittanning Brewing Co., supra, 259 Pa. at page 516, and see 517, 103 A. at page 342.

Officers and directors "must act in the utmost good faith, and cannot deal with the funds and property of the corporation, nor utilize the influence and advantage of their offices, for any but the common interest. * * * It is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment." Bailey v. Jacobs, 1937, 325 Pa. 187, at page 194, 189 A. 320, at page 324. The law will not permit a fiduciary to place himself in a position which invites conflict between self interest and integrity. Id. " 'They must devote themselves to the corporate affairs with a view to promote the common interests and not their own, and they cannot, either directly or indirectly, utilize their position to obtain any personal profit or advantage other than that enjoyed also by their fellow shareholders. * . * * In short, there is demanded of the officer or director of a corporation that he furnish to it his undivided loyalty; if there is presented to him a business opportunity which is within the scope of its own activities and of present or potential ad-

vantage to it, the law will not permit him to seize the opportunity for himself * * *.' Lutherland, Inc., v. Dahlen, [1947] 357 Pa. 143, at page 151, 53 A.2d 143." Howell v. McCloskey, supra, 375 Pa. at page 106, 99 A.2d at page 613; and see Weissman v. A. Weissman, Inc., 1955, 382 Pa. 189, at page 193, 114 A.2d 797, at page 799.

The offer by plaintiff to the "inside group" in an effort to gain "numerical control" at a price above the market—offered ostensibly because of their position—was an opportunity which if accepted would have placed them in a position of jeopardy of being held responsible to account for the excess to the other stockholders. See "Transactions in Corporate Control", 104 U. of Pa. L.Rev. 725 at 731–732, 801–805, 809 et seq., 815–817, 839; Fraser Fund v. Fraser, 1944, 350 Pa. 553, at page 565, 40 A.2d 22, at page 27; see and cf. Pearlman v. Feldmann, 2 Cir., 1955, 219 F.2d 173, at page 178. Plaintiff having endeavored to bring about this situation could very well be charged with unclean hands. We do not, however, wish to stop there. Because the present action involves the rights of so many others we have decided to dispose of it on the merits.

Ordinarily the burden of proving fraud and a breach of duty would be upon the plaintiff. Hunt v. Aufderheide, supra, 330 Pa. at page 380, 199 A. at page 354; Malone v. Lancaster Gas Light Co., supra, 182 Pa. at page 321, 37 A. 932; Hirshhorn v. Mine Safety Appliances Co., D.C.W.D.Pa.1952, 106 F.Supp. 594, at page 600, affirmed 3 Cir., 1953, 203 F.2d 279; see and cf. Spering's Appeal, supra, 71 Pa. at page 21, " * * * when we ascertain and determine that they have not sought to make any profit not common to all the stockholders, we raise a strong presumption that they have brought to the administration their best judgment and skill." As to the quantum of proof, see and cf. Wagner v. Somerset County Memorial Park, Inc., 1953, 372 Pa. 338, at page 341, 93 A.2d 440, at page 441.

We have, however, applied the more strict rule (see Hirshhorn v. Mine Safety Appliances Co., supra, 203 F.2d at page 283, and see Pearlman v. Feldmann, supra, 219 F.2d at page 177), and placed the burden upon defendant and indirectly its officers and directors of proving that the transaction was entered into in good faith; free of fraud; and consistent with their fiduciary obligation; inherently fair, and to the best interests of the corporation and its stockholders. See Pepper v. Litton, 1939, 308 U.S. 295, at page 306, 60 S.Ct. 238, at page 245, 84 L.Ed. 281; Geddes v. Anaconda Mining Co., 1921, 254 U.S. 590, at page 599, 41 S.Ct. 209, at page 212, 65 L.Ed. 425; Weisbecker v. Hosiery Patents, Inc., 1947, 356 Pa. 244, 51 A.2d 811; Bonini v. Family Theatre Corp., 1937, 327 Pa. 273, 194 A. 498.

"A director is not per se disqualified from voting upon matters in which he has a financial interest either direct or indirect. However, his participation in such a vote will be closely scrutinized, and if it appears that the director availed himself of his position to further his personal interests rather than the welfare of the company, action predicated upon that vote may be rescinded or restrained * * *" Bowman v. Gum, Inc., 1937, 327 Pa. 403, at page 410, 193 A. 271, at page 274.

"But this cannot go to the extent of holding all acts done in their own interests voidable at the election of the minority. The most that should be required of them is that they should not exercise the legal power, to which their larger interest entitles them, to secure an advantage to themselves over the minority. But their bona fide action for the best interests of all should not be set aside." Weisbecker v. Hosiery Patents, Inc., supra, 356 Pa. at page 258, 51 A.2d at page 817; see and cf. Weissman v. A. Weissman, Inc., supra, 382 Pa. at pages 193, 194, 114 A.2d at page 799, where there was no collision between fiduciary duty and personal interest; and see Halpern v. Grabosky, supra, 296 Pa. at pages 112–113, 145 A. at page 835.

General propositions do not settle cases. Each case must be decided on its own facts. South Penn Collieries Co. v. Sproul, 3 Cir., 1931, 52 F.2d 557, 561, 562; Briggs v. Spaulding, 1891, 141 U.S. 132, at page 152, 11 S.Ct. 924, at page 931, 25 L.Ed. 662. "The rule of law is too well settled to be questioned— that there should not be substituted in corporate management the wisdom and judgment of a chancellor for the discretion and skill of the directors elected by the shareholders to manage the corporation." Bowman v. Gum, Inc., supra, 327 Pa. at pages 409, 410, 193 A. at page 274; Provident Trust Co. of Philadelphia v. Crouse, supra, 40 Pa.Dist. & Co.R. at page 632; see Otis & Co. v. Pennsylvania R. Co., supra, 61 F.Supp. at page 911, " 'Courts have properly decided to give directors a wide latitude in the management of the affairs of the corporation provided always that judgment, and that means an honest, unbiased judgment, is reasonably exercised by them * * *. The directors are entrusted with the management of the affairs * * *. If in the course of management they arrive at a decision for which there is a reasonable basis, and they acted in good faith, as the result of their independent judgment, and uninfluenced by any consideration other than what they honestly believe to be for the best interests of the * * * (corporation), it is not the function of the court to say that it would have acted differently * * *.' "

Upon an examination of the entire record, we find that the officers and directors of defendant corporation served none other than the common interests in entering into the contract in question. Surely they should not be required to dally until creeping paralysis destroyed the investment of all. They took a business risk, see Hunt v. Aufderheide, supra, 330 Pa. 362, 376, 377, 199 A. 345, to solve a difficult situation. It may well be that introduction of fibre grass, plastics and aluminum will meet their pressing need for diversification and that future steps will have to be taken and the articles amended. That will, of course, require stockholder approval. We, however, must view the situation as of the time of the directors' meeting. We find that the contract was legal and within the authority of the Board of Directors; that the stock was legally issued without additional stockholder approval; that title to the certificate passed; that the consideration was, in the best judgment of the directors, adequate; that the consequent "dilution" in voting rights was consistent with law; and finally, there was no failure to comply with the Securities Act of 1933; no breach of the fiduciary duty.

In view of the foregoing, the plaintiff's prayer for relief will be denied and judgment entered for the defendant.